UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

-o0o-

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MARCEL MALU MALANGA; TYLER CHRISTIAN THOMPSON, JR.; JOSEPH PETER MOESSER,<br>Defendants. | Case No. 1:25-cr-00153 |

BEFORE THE HONORABLE DUSTIN B. PEAD

---

Wednesday, May 28, 2025

1:51 p.m. to 6:30 p.m.

Detention Hearing

---

Reported by: Michelle Mallonee, RPR, CCR (801) 209-4979
351 S. West Temple, #7.130, Salt Lake City, Utah 84101

## APPEARANCES

For Plaintiff:

BRYAN R. WHITTAKER, ESQ.
JONATHAN STOWERS, ESQ.
U.S. ATTORNEY'S OFFICE
111 S. Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
(801) 325-3214
bryan.whittaker@usdoj.gov
jonathan.stowers@usdoj.gov

TANYA SENANAYAKE, ESQ.
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue
Washington, DC 20530-0001
(771) 202-1665
tanya.senanayake3@usdoj.gov

For Defendant Marcel Malu Malanga:

EMILY A. STIRBA, ESQ.
JEFFREY N. CLARK, ESQ.
FEDERAL PUBLIC DEFENDER, DISTRICT OF UTAH
46 W. Broadway, Suite 110
Salt Lake City, Utah 84101
(801) 524-4010
emily_stirba@fd.org
jeff_clark@fd.org

For Defendant Tyler Christian Thompson, Jr.:

SKYE E. LAZARO, ESQ.
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
(801) 532-1500
slazaro@rqn.com

TRINITY S. JORDAN, ESQ.
DENTONS DURHAM JONES & PINEGAR, P.C.
111 South Main Street, Suite 2400
Salt Lake City, Utah 84110
(801) 415-3000
trinity.jordan@dentons.com

For Defendant Joseph Peter Moesser:

ADAM P. MERRILL, ESQ.
WATERSHED LAW LLC
55 W Monroe Street, Suite 3200
Chicago, Illinois 60091
(312) 641-6492
amerrill@watershed-law.com

G. FRED METOS, ESQ.
LAW OFFICES OF G. FRED METOS
299 S. Main Street, Suite 1300
Salt Lake City, Utah 84111
(801) 535-4350
fred@gfredmetos.com

* * *

Wednesday, May 28, 2025; Salt Lake City, Utah

1:51 p.m.

-o0o-

THE COURT: All right. Thank you, everyone, for your patience. Let's go ahead and go on the record.

Hello, everyone. Good afternoon and welcome. My name is Dustin Pead. I'm a magistrate judge in Salt Lake City, Utah. Today's date is May 28th, 2025. I'm here in 2:25-cr-153, United States versus Marcel Malanga, Tyler Thompson, Jr., Benjamin Zalman-Polun, and Joseph Moesser.

Would counsel please make their appearance, starting with the government.

Mr. Whittaker?

MR. WHITTAKER: Good afternoon, Your Honor. Bryan Whittaker for the United States.

MS. SENANAYAKE: Good afternoon, Your Honor. Tanya Senanayake for the United States.

MR. STOWERS: And John Stowers for the United States.

THE COURT: Thank you.

Ms. Stirba on plaintiff of Mr. Malanga?

MS. STIRBA: Good afternoon, Your Honor. Emily Stirba and Jeffrey Clark on behalf of Mr. Malanga.

THE COURT: Great.

Ms. Lazaro, on behalf of Mr. Thompson?

MS. LAZARO: Thank you, Your Honor. Skye Lazaro and Trinity Jordan on behalf of Mr. Thompson.

THE COURT: Thank you.

And Mr. Metos on behalf of Mr. Moesser?

MR. METOS: Fred Metos and Adam Merrill on behalf of Mr. Moesser.

THE COURT: Thank you to all of you, especially Mr. Thompson, Mr. Malanga, and Mr. Moesser.

Of course we last met near the end of April. At that time, we went through what was called the "initial appearance," entered not guilty pleas. We set the case for scheduling, but we had to set these matters over for a detention hearing.

A couple of things I want to note upfront, that first, I went back and reviewed a couple of things. The motion for detention that was filed originally by the government. I've gone back and reviewed the amended pretrial service report for Mr. Moesser. I've also seen updates or amendments to pretrial service reports for Mr. Thompson and Mr. Malanga.

The government has the burden of persuasion in this setting, either by clear and convincing evidence that the defendants are a danger to the community, or a preponderance of the evidence that they're unmanageable risks of flight.

In the motion, the government asserts both a triggering mechanism for detention and a rebuttable presumption. Let me go ahead and address that first.

Ms. Stirba, on behalf of Mr. Malanga, do you contest either the authority to hold a detention hearing or the rebuttable presumption?

MS. STIRBA: No, Your Honor. We agree with the F1 factor. We disagree about the F2 factor, but we agree he's eligible on the presumption.

THE COURT: Of course. Thank you.

Ms. Lazaro, on your behalf?

MS. LAZARO: Thank you, Your Honor. We agree with the way Ms. Stirba characterized it.

THE COURT: All right.

And Mr. Merrill?

MR. MERRILL: Yes, we're also in agreement as to that.

THE COURT: Great. So the government has the burden of persuasion.

Mr. Whittaker, let's start with you.

MR. WHITTAKER: Thank you, Your Honor. Given the length of this argument, would it be all right if I remain seated while we make the argument?

THE COURT: Of course.

MR. WHITTAKER: Thank you.

Your Honor, the government would like to proceed in the following way. I would address under the factors that the Court would consider the nature and circumstances of the offense charged, the weight of the evidence against the defendant, and the nature and seriousness of the danger to any person in the community that would be posed by the persons' release. And Ms. Senanayake will address the nature -- I'm sorry, the history and characteristics of Mr. Marcel Malanga and Mr. Tyler Thompson, and then Mr. Stowers will address the history and characteristics of Mr. Moesser, if that's okay with the Court.

THE COURT: Terrific. Thank you. No problem.

MR. WHITTAKER: Your Honor, I'd like to start with the presumption of detention in this case. The grand jury did return an indictment and established probable cause that the defendants committed the offenses as charged in the indictment. And based upon the charges in the indictment, it would trigger the presumption of detention, and we would rely upon the presumption of detention in this case.

We recognize that it is a smaller burden, but we recognize, also, that some evidence must be provided to show that the defendants are not a flight risk nor are they a danger to the community. We'll let the defense address that and come back and respond to whatever evidence they may present or not. But we would rely upon the presumption of

detention.

I'd like to start with the nature and circumstances and the seriousness of this offense. These are some of the most serious crimes that the United States Code has. And these defendants have been charged with five of those very serious offenses.

This conspiracy, Your Honor, they conspired to engage in extreme physical violence that included having handguns, assault rifles, a flamethrower, which they intended to use to light people on fire, and building and constructing explosive devices or bombs.

And not only did they intend to construct explosive devices and bombs, they intended to ensure that those bombs had shrapnel, and they were going to add buckshot to the bombs to make them more lethal and with the intent to kill people.

They did conspire to kill people, including the president of a foreign country and other high-level government officials in the Democratic Republic of the Congo. They conspired to kidnap others, they conspired and actually did provide material support to that conspiracy.

We anticipate that Mr. Moesser may argue that somehow he's differently situated because he did not actually travel over to the Democratic Republic of Congo and engage in the armed coup attack on May 19th. But what the

evidence shows is that Mr. Moesser actually did provide material support. He provided training, he provided expertise, he provided explosive devices. He did, in fact, provide material support. He's no differently situated. He was an active member of that conspiracy and intended to further the goals of that conspiracy.

So we would suggest that the fact that Mr. Moesser didn't actually travel -- he actually did intend to travel, and I'll show you in the evidence that we're going to present that he had acquired a plane ticket, he just did not actually travel.

Marcel and Tyler -- and I'm going to refer to them by their first names, if that's okay, calling Marcel "Marcel," because the father, Christian Malanga, was a part of this conspiracy. He's now deceased. But in order to avoid confusion, I'm going to refer to him as "Marcel" just for clarification.

THE COURT: Okay.

MR. WHITTAKER: So Marcel and Tyler, they tried to fool many people by claiming that they knew nothing about this plot to conduct an armed coup attack, that is to overthrow the government of a foreign country and to kill the president of the DRC. Many members of their family and many of their friends believed that the defendants knew nothing about the armed coup attack and that Christian

Malanga, Marcel's father, somehow held them at gunpoint and forced them to engage in this brutal attack. They will claim -- and they did try to carefully hide their plans, and apparently deceived even some of those closest to them.

Even in the military tribunal that was held in the Democratic Republic of Congo, the defendants, Marcel and Tyler, told the Court there that they were forced by Christian Malanga to participate in the attack, and that they didn't know when they went over to Africa that this was going to happen.

But the evidence I'm going to show to the Court today will show otherwise. It will show that they were deceitful and they deceived even their closest members of their family.

And so for them to come to court today and argue that they would provide assurances to this Court that they are not dangerous and they will not flee is completely unreliable, because they've been deceitful and untruthful with even those closest to them.

Indeed, the evidence that I'll show to the Court today will show that they planned, they plotted, they prepared, they strategized, they deliberated, they trained, they recruited, and they conspired to carry out this armed coup attack. And they did all these things for many months prior to the attack, both in the United States and in

Africa.

Your Honor, I want to add one thing, one point of clarification, and I meant to do this at the beginning. There's been media reports that have come out that have said that these defendants, at least Mr. Polun, Mr. Malanga, and Mr. Thompson, were returned to the United States to serve out a sentence that was imposed by the Democrat Republic of Congo and that government, and that is not accurate.

These defendants are not being held on any sentence or any charges that are pending in the Democratic Republic of Congo. They are only being held on the current indictment that's pending before this Court. And so we would -- as we go through this analysis today, we would suggest that that's even a greater risk that they're going to flee and want to leave, or that they actually could flee and that they actually could be a danger to the community, because there's nothing else that would hold them.

And then, Your Honor, when we look at the weight of the evidence in this case, we recognize that of the four factors, this is the least forceful of the factors. But even in some cases -- in fact, the case we cited from the District of DC, the *Nikolow* case, when the weight of the evidence is so strong, it can overcome favorable factors, like history and characteristics of a defendant, including long ties to the community, because the sheer weight of the

evidence against the defendant and the nature and seriousness of the danger posed by the defendants suggests that they should be held. And we would suggest that the Court in this case should do that.

In this case, there's direct evidence, including video recordings of them committing the crimes.

The evidence is reliable because it consists of recordings of the defendants' own statements; physical evidence, such as -- was recovered, such as drones, a flamethrower, firearms, and explosive devices. In fact, we'll show the Court that many explosive devices were found in Mr. Moesser's home when the FBI searched in April of 2025.

In this case, the grand jury found probable cause that there were 34 overt acts, as alleged in the indictment. To support -- for example, to support a charge under -- a conspiracy -- 956, there only needs to be one overt act that was committed within the United States. In this case, there's 34 overt facts that the grand jury found probable cause that these defendants engaged in.

The volume of evidence in this case, Your Honor, as the Court is fully aware, the United States filed an 82-page criminal complaint supporting the charges in this case. We would ask the Court to rely upon that evidence that was in the affidavit of Special Agent Simkins as

consideration for detention today.

And Your Honor, I would say in my 18 years as a assistant United States attorney, that's the biggest complaint I've ever filed. This is not a normal, typical pattern. The weight of the evidence in this case is substantial; in fact, it's staggering.

In this case, the evidence is also corroborated from different sources, from witness testimony, from social media accounts of the defendants, from video recordings. So it's corroborated. So in short, Your Honor, the weight of the evidence against the defendants is both reliable, strong, and supports detention in this case.

With the Court's permission, I'd like to walk the Court through some of the evidence. We have photographs, we have video recordings. I'd like to just go through parts of the conspiracy for the Court today to consider as we talk about detention.

THE COURT: Of course.

MR. WHITTAKER: Marcel Malanga and Mr. Polun, they recruited and attempted to recruit others to join the conspiracy to fight with these rebel forces.

Mr. Malanga, before he left for Africa, posted on his social media this image, where he sent to his friends trying to recruit them to come with him to Africa. He said, "If want to make $50-100K message me." And he says,

"warriors only." Clearly, he's trying to recruit others to come join with him and be a warrior in this armed coup attack. And some witnesses, at least one witness that the FBI interviewed -- I should say there's multiple witnesses that saw this and realized that Marcel was trying to pay them to come to Africa.

Mr. Daniel Gonzalez, who is one of Mr. Marcel Malanga's friends, shortly after the armed coup attack, he made statements to the Associated Press. He told them in this article on May 24th of 2024 and in an FBI interview that he declined a $100,000 offer to travel to the Congo on a, quote, security job that was a covert coup attempt.

What he said to the Associated Press was that Marcel had offered him 50- to $100,000 to spend four months in the Congo as a security guard for his politician father, meaning Christian Malanga. The 22-year-old FedEx worker strongly considered it and said it lacked concrete details. And what he said is that, "I feel really sad for Tyler and Marcel but, at the end of the day, I can just be grateful that I didn't go because I would be stuck in that same scary situation."

THE COURT: Do you believe that he had the money that he claimed he did that he could offer?

MR. WHITTAKER: We do believe he had funding, Your Honor, at least that was the narrative. We don't have

financial records that show the funding. But we do believe that there was the funding there, and that Christian Malanga had a gold mining operation in Africa and other various business operations and appeared to have lots of money. And, in fact, on Marcel's social media accounts, there's many pictures of him flashing big amounts of money, like large amounts of cash. It looks like drug dealer-type photographs, where they would have a lot of cash laying around, which is not a normal thing for an early 20-year-old young man from Utah that doesn't have a significant job.

THE COURT: Got it.

MR. WHITTAKER: Zaiden Wright, who is also one of Marcel's friends, stated that Marcel Malanga and Polun, Mr. Polun, called him while they were here in Utah. In fact, Mr. Zaiden Wright was in a class down at BYU. And they called him and tried to recruit him. And Mr. Polun introduced himself as Christian Malanga's chief of staff. And then Marcel offered Zaiden $50,000 to go to Africa with him, with the intent of going to a home to invade it.

Marcel and Mr. Polun told Zaiden that the purpose of the trip was to get, quote, everyone ready for arresting the secretary of defense in the Congo. Marcel and Mr. Polun said that they already had a small military group to, quote, raid the premises.

Mr. Wright also stated that Mr. Polun told Zaiden

that Mr. Polun could expedite his passport. Marcel and Mr. Polun told Zaiden that they would be heroes, and that Zaiden would be able to be on live television because everything would be recorded. And Marcel and Mr. Polun told Zaiden that he would be provided a gun in the country.

THE COURT: What was the theory about expediting a passport? Was it just simply asking -- paying an extra fee to expedite it through a state, or was there some hint --

MR. WHITTAKER: I think they were trying to get ready to leave to go to Africa, and so they were just trying to make that not a consideration, like, hey -- what we know is I think some of the other friends were approached -- there were some other friends that were approached. And I can think of at least one instance where one friend turned him down and said, I can't get my passport in time. And so this may have just been an effort to try to say, Don't let that be an obstacle to coming to join us. We can pull strings. We can get an expedited passport.

THE COURT: When you say "pull strings," you mean just pay an expedited fee?

MR. WHITTAKER: Probably.

THE COURT: Got it. So nothing sinister, just saying, hey, look, we'll pay the extra money to get it done faster?

MR. WHITTAKER: I think that can be the inference,

yes.

THE COURT: Okay. Go ahead.

MR. WHITTAKER: On Mr. Marcel Malanga's Instagram account, he posted several of these pictures. You'll see it's written in small white writing. It's a little bit hard to see. The photograph on the left says, "war," and the photograph on the right says "more war."

And two more pictures, posts some more pictures of guns. And on the left, it says, "some more war." And on the right it says, "war ready" with a smiley face emoji.

What the FBI learned, Your Honor, is that these photographs were taken in Mr. Moesser's hidden basement storage room, loaded full of firearms and ammunition, and that Marcel had taken these photos there and then added those captions that he was getting ready for war.

And you'll see the other two pictures that resemble what Mr. Malanga had posted on his Instagram account.

Part of this conspiracy included Marcel Malanga and Tyler Thompson obtaining and equipping an aerial drone with the intent to use it to deliver destructive devices and to carry an incendiary device or a flamethrower.

What the FBI learned, Your Honor, is that Mr. Malanga purchased a DJI S1000 drone on March 12th, 2024, from an eBay user. He purchased it on eBay. And

Mr. Malanga went to Southern California, in fact, Studio City, California. He met with this eBay user. They flew the drone in a park. And then he purchased the drone and shipped it on a commercial airline back to Utah.

I have a video here of Tyler and Marcel working on the drone and learning how to attach a flamethrower device to it. This video is a very short video. The quality is not very good. It's about nine seconds. But you also hear in the video where Marcel says, "Tyler, hold that down."

The FBI believes this video was taken at Mr. Moesser's residence on the kitchen table. And you'll see some other videos that you'll be able to see that. But if you notice that tablecloth that's on the table, you'll see that in a couple more videos that I'll show the Court in a minute.

(Video played.)

MR. WHITTAKER: So you have Tyler and Marcel there in Mr. Moesser's house, conspiring together to assemble a drone, which they intended to use as a lethal weapon.

In April of 2024, video discussions between Marcel Malanga and Moesser at Moesser's residence, you'll see here -- this is a better quality video -- they're talking about attaching this flamethrower to the drone. Moesser is talking about fixing some screws on the wing of the drone.

(Video played.)

MR. WHITTAKER: So the voice that you're hearing there is Marcel Malanga talking about putting the brackets on. And they're learning how to do this so that when they get to the Democratic Republic of Congo, they'll know how to attach that flamethrower device.

Your Honor, the evidence also shows that this drone that you're seeing on your screen is, in fact, the DJI S1000 drone that was recovered by the DRC after the attack, when Mr. Malanga, Mr. Thompson, and Mr. Polun were taken into custody. And this, in fact, is the same drone, as confirmed by a serial number that it was, in fact, the same drone. So that's the drone that they used to attach the flamethrower device to.

You'll see on your screen, Your Honor, an email from Tyler Thompson to quinn@throwflame.com. In the email, Tyler says, "hello, im reaching out on behalf of Christian malanga. We are interested in purchasing your tf-19 attachment for 1499. I was told you do not accept cash, I was wondering how you accept payment?"

So he says there he's working for Christian Malanga. This is not somebody who was coerced into an attack, this is somebody who is working on behalf of Christian Malanga to prepare for an armed coup attack in the Democratic Republic of Congo. Throw flame -- you'll see in a second, I'll show you a picture, a stock photo image of

that flamethrower device onto the drone.

But, importantly, on April 10th, 2024, this is the day Mr. Malanga and Mr. Thompson, who had both been living together in Mr. Thompson's residence, left Utah to fly to Africa. And you'll see in the middle of that picture, there against the back wall is a tall, skinny brown box with shrink wrap around it. That box is the flamethrower device, which we saw in a video in Mr. Moesser's house. And they packaged it up, and they're going to take it to Africa. And I'll show the Court in a minute, when they get to Africa, they actually show off the flamethrower device. And I'll show the Court that video.

What's important is they had that device here in Mr. Thompson's residence, right here in Utah. And friends and family didn't know that they had that flamethrower device here in Utah, nor did they have any way to control or to oversee or to try to talk Mr. Malanga and Mr. Thompson out of using that flamethrower or going to the DRC to commit an armed coup attack.

So you'll see here, this is -- when they get to Africa, this is the TF-19 WASP flamethrower device, which they purchased from quinn@throwflame.com.

In the left, on the left-hand side, you'll see Mr. Thompson opening a box. And on the right, you'll see him displaying the flamethrower that he attached to the

drone.

Here's just a stock image, Your Honor, so you can see more clearly how that flamethrower device attaches to the drone. It attaches underneath the bottom. On the right side is the gas tank that you put the gas in, or the flammable liquid in. And then it shoots out the flame on the right-hand side of the picture.

On February 29th, 2024, Mr. Thompson, his Google activity, he searched for "drones that can carry and drop things."

On March 3rd, 2024, Mr. Thompson has Google activity that shows that he searched for a "flamethrower drone."

On that same day, he also visited "DJI Mavic 2 Zoom." It has a web link there. But what's significant there is it's an air dropper release mechanism. These air dropper release mechanisms are these drones that carry and drop things. Their plan was to have a dropping mechanism that would drop bombs or destructive devices from the drone. That's how they intended to use the drone to deliver a bomb.

Again, it's not individuals who were forced into this armed coup attack, this is methodically planning an attack.

Also on March 3rd, Tyler Thompson visited a site, a Google search of "flamethrower."

Mr. Moesser provided self-defense and firearms training in Utah to Christian Malanga's bodyguards from Africa. On April 8th, after Mr. Moesser was arrested, he gave a Mirandized interview to the FBI. I wanted to play a short clip from this interview that he told the FBI about how he did provide training, firearms training to at least some of the Christian Malanga's security personnel.

(Audio played.)

MR. WHITTAKER: Okay. And then part of that interview, it continues on this next slide.

(Audio played.)

MR. WHITTAKER: So Mr. Moesser, at the request of Christian Malanga, who is definitely a member of this conspiracy, is providing training for security personnel that presumably were -- participated in that armed coup attack.

You'll notice in this picture, just to answer what maybe is in the Court's mind about the Tooele sheriff deputy there. Tooele County received a concerned complaint from a citizen, so they went out to check out what was going on out in Tooele County. And it happens to be in this picture that was found in social media accounts of one of the defendants.

THE COURT: In his statement, did Mr. Moesser indicate that he knew what they were being trained for specifically?

MR. WHITTAKER: Yeah. I think the evidence will show that as we continue through this --

THE COURT: Got it.

MR. WHITTAKER: -- that he was creating, Mr. Moesser was, in fact, building special weapons called "the Congo special," that it was -- him and Christian texted about it was time for change in the Congo. And so Mr. Moesser clearly knew what was going on. In fact, Mr. Moesser, as I indicated before, had a plane ticket to go over and participate in the armed coup attack. And Mr. Moesser had told an FBI confidential human source that it was his plan to go over and be sniper in the armed coup attack. And then he was to be off in the distance, but that was his plan.

THE COURT: Okay.

MR. WHITTAKER: The rebel army acquires and attempted to acquire firearms from Moesser to use during the attack.

In these text messages between Christian Malanga and Peter Moesser, Christian says, "Pete can it be shipped to the [sic] Congo? Or can I have someone bring it in? In the next month my team and I will be ready for change in the DRC."

Mr. Moesser says, "What are you talking about.? [sic] the Congo special? Hmm how many do you need?"

"Yes Pete the Congo special. For this operation I will need 5."

"Okay. How do I get them in your hands, any suggestions?"

Mr. Moesser told the FBI about those Congo specials, and I want to play that part of the interview for the Court.

(Audio played.)

MR. WHITTAKER: The interview -- I'm sorry. sorry, I thought I had one more slide there. I don't.

In the next slide, this is on January 26th, 2024, Marcel messaged Moesser over Facebook Messenger and introduced himself as Christian's son, asking Moesser if he still sold firearms.

He says, "Hello Pete how are you, I am Christian malangas son. We met when I was a little kid, just wondering if you still sale firearms? We should catch up and get dinner!"

Eventually, they did catch up. And in fact, here's an image of Marcel in Mr. Moesser's home, holding an assault rifle, that home being here in West Valley, Utah.

Again, part of the conversation that Mr. Moesser had with the FBI.

(Audio played.)

MR. WHITTAKER: And Mr. Moesser did tell an FBI

confidential human source that he was going to be a sniper in the attack, and he was going to be off in the distance with a sniper rifle.

When the FBI searched Mr. Moesser's home, they did, in fact, find a .308 caliber rifle in Mr. Moesser's bedroom.

In the email on your screen, Your Honor, I'd referenced that there was a plane ticket that apparently had been purchased for Mr. Moesser. This email is from Ben P, or ben.polun@gmail.com, to customer service at this airline. And he says, Ben says, "To whom this may concern, I am writing because my uncle Joseph Peter Moesser ticket number...was unable to fly johannesburg south africa with marcel malanga and Tyler Thompson because Mr. Peter Moesser was sick the day of the flight. We are looking to reschedule the flight. We spoke to a representative but was unable to assist us over the phone when we called prior to the flight. Could you please assist with a ticket for April 21-22 from salt lake city Utah to johannesburg south africa. Thank you for your assistance and understanding. Respectfully, Ben Polun."

Another excerpt from the interview with the FBI and Mr. Moesser.

(Audio played.)

MR. WHITTAKER: The rebel army acquires and

attempts to acquire destructive devices and components. We had here a second source.

I would first reference the Court, in the complaint affidavit, there's a discussion in there about how the members of the conspiracy, specifically Marcel Malanga, attempted to acquire explosive devices from a soldier in Ukraine. I think he called himself "the Ukrainian soldier." And just for sake of time, Your Honor, we haven't gone through all the evidence in this case. We're trying to condense this presentation.

But in that affidavit, it talks about how Marcel reached out multiple times, and then we have photographs in there of those destructive devices that Marcel tried to acquire.

So that was one source of destructive devices. And in that discussion with the Ukrainian soldier, they talked about how to deploy those destructive devices by dropping them from a drone.

The second source that they attempted to acquire these from was Mr. Moesser. That's the second source.

In this text message chain here, you'll see Mr. Moesser says, "I met with Ben," meaning Ben Polun. This is a message, I'm sorry, with Christian Malanga, between Peter Moesser and Christian Malanga. And he says (as read), "I met with Ben and you son," or your son, "the other day.

We had a nice conversation. I'm interested in" seeing -- "selling one of my machines to finish some parts that you want." He talks about how he's working on these and delivering and shipping them to the Congo.

This is important because it shows that Ben and Marcel worked together with Mr. Moesser to work on acquiring these explosive devices that they planned to use in the Congo attack.

And I'm sorry, at the end, he says, "I am working on a proto-type of the other two units that you need." So he's reporting back that he is, in fact, doing work on the prototypes.

And then some more of the messaging back and forth. From Christian, it says, "Hi Good day PeteI, [sic] hope you are doing well. Thank you for your message. I look forward to following out our plan together we discussed many times. Now is the time for change. Please do not hesitate to ask me any questions. I look forward to seeing you."

This shows how Pete Moesser and Christian Malanga had conspired together for some time and discussed plans many times together about how to effect change in the Congo, meaning how to conduct an armed coup attack.

This is an image of an invoice that was sent from Mr. Moesser to Ben Polun. I'll blow it up here in a second

so you can see what's on this invoice. But you'll see it says, "Bill to" here on the top left-hand side, it says to "Ben." And this was dated March 6th, 2024.

Mr. Moesser is charging them for the work that he's been doing on the Congo special and on the explosive devices. So you'll see he's working on lower receivers for AR-15s, collapsible stock, and he's charging them for all this.

And then you'll see in here he talks about "loud item does not include gun powder," 25/price each, $36/$900. And then he says, the "explosive device" -- and he clearly references an explosive device -- "does not include gun powder."

And then he also says, "This not include shipping, hopefully you can take care of that." And then he bills them $7350.

Mr. Moesser -- Mr. Stowers will talk about his prior criminal history. But it is important to note, Mr. Moesser was charged in this district in the United States District Court previously for trying to take gun powder onto an airplane. Well, he learned his lesson, I think. And so he taught the members of this conspiracy that, hey, you can't actually ship gun powder on an airplane. So our plan is, we're going to not put the gun powder in them. And you're going to acquire the gun powder

when you get to South Africa, and then you can load them up there.

And you'll see in a minute, he'll give some specific directions to the members of the conspiracy. But clearly, he had learned that that's not a good idea. So he's conveying his expertise, if you will, on how to get explosive devices into Africa.

In April of 2024, this is video of Marcel Malanga and Moesser discussing these destructive devices at Moesser's residence. You'll see the same tablecloth, you'll see the same wood-type cabinets in the back. And they talk about how these would be dropped from a drone.

(Video played.)

MR. WHITTAKER: So you hear them in there, Your Honor, talking about the capabilities of that explosive device and the plastic explosive devices, or PVC pipe bombs that they constructed. And Marcel first asked, Well, the PVC ones will blow up without shrapnel, right?

And Moesser says, no, no, no, no, those will have shrapnel.

And Marcel says, Perfect. Perfect.

And then these, of course, the metal pipe bombs will have shrapnel. And the intent of this is that when that's dropped from the drone, that plunging device will come up in and hit a primer, and that primer will ignite the

gun powder that's in the explosive device and set it off and cause it to explode and to kill people.

And you hear the excitement in Marcel's voice. He's excited that these things are going to work. And he said perfect, perfect. It's just what they wanted and what they planned.

All right. So here's another video.

(Video played.)

MR. WHITTAKER: Okay. So they're going to ship them not put together. They're going to send them over there. And you hear Marcel talk about how they were going to acquire the gun powder in "Joburg," meaning Johannesburg, South Africa. And then they're going to specifically get 209 primers in Johannesburg, South Africa. And they're going to get buckshot.

This is what Mr. Moesser told the FBI about these destructive devices. Sorry. I don't know why that's not playing.

(Audio played.)

MR. WHITTAKER: Pretty ingenious, at least that's what Mr. Moesser thought. It was ingenious to build a device like that that could kill people, including the president of a foreign country.

This is a continuation of part of that interview.

I apologize, Your Honor. For some reason that's

not wanting to play.

THE COURT: Can you scroll down to the microphone button there.

MR. WHITTAKER: Yeah, that's what I've been trying to push on, that microphone thing --

THE COURT: Maybe you can manually do that.

MR. WHITTAKER: -- and it just causes it to -- let me try one more thing.

(Audio played.)

MR. WHITTAKER: He's describing how that bomb's going to work.

This is a video from April of 2024, shortly before -- well, in April of 2024, recorded by Zaiden Wright of some of the destructive device components inside the trunk of his car.

(Video played.)

MR. WHITTAKER: So you'll see -- short video. But in the video, you see that there's at least 39 firing pins in the first box. Second box, there's PVC endcaps with a hole in them, which is where the primers would go. And the third picture on the right, there's PVC endcaps and pipes. You see the pipes in the other box.

When the FBI searched Mr. Moesser's residence -- Your Honor is aware of this search. Your Honor signed a search warrant for Mr. Moesser's residence -- explosive

devices and firearms were found in Mr. Moesser's residence. Here is one of those pipe bombs that was found in Mr. Moesser's shop. You can see the endcap taken off, and it has the U bracket on there, which helps weight it when it's dropped from the drone to help -- where the firing pin goes through -- and activate the device.

The FBI also found the boxes of PVC pipes, what we've seen in the video that Zaiden Wright had. The picture on the right shows the firing pins, endcaps, and other various explosive device components.

Another picture of additional components that were found.

Many of these devices were found and hidden out in Mr. Moesser's backyard here in West Valley, Utah. You'll see in this Rubbermaid storage unit, there's a bunch of food on the top shelf. And when it's opened underneath on the bottom, the FBI found these explosive devices and explosive device components.

Here's a box that says "Customer Parts" inside. When they open the box, there's explosive device components inside of there.

You'll see in the back -- on the picture on the left, in the back of the storage unit there, there's a bunch of the firing pins that are in the back that are kind of spilling out of that box.

Also, in Mr. Moesser's master bedroom, they found several explosive devices that were just right next to the bed there. That's where they found them. Interesting to note that this is a year later, and these devices are still there, including in his master bedroom. He just decided it was a good idea to keep explosive device components in there. And clearly, his wife didn't think that was a problem. She didn't call law enforcement or alert law enforcement that there was explosive devices in the bedroom.

Also, Mr. Moesser had -- the reason he was able to manufacture these is, he has a shop on his residence that has all kinds of metal lathes and metal working equipment. And he was a professional at doing that. This is some of the pictures from his shop. You can see that various explosive device components were found by the FBI in his shop.

Marcel Malanga and Tyler Thompson trained with firearms in Utah. The FBI acquired surveillance footage of Marcel and Tyler training with firearms at Legacy Shooting Center in West Jordan, Utah, in March of 2024. You'll see in this photograph from the security footage from Legacy Shooting, Marcel is shooting an AR-style rifle, and Tyler Thompson is taking a photo or video of that.

Mr. Thompson's internet activity included searching for gun shooting ranges in Utah, including

searching specifically for "Legacy Shooting Range."

You see some other photographs taken from social media accounts of Marcel Malanga, of him training with firearms or displaying firearms. This is significant. On the left-hand picture, it says, "Train2kill #warbaby." And I want the Court to notice that, because in an upcoming video in South Africa, Mr. Malanga posted another video, which we'll show the Court in a minute, but it's important, that "Train2kill." This is not somebody who is just going to a firing range to shoot for target practice, this is somebody who, by his own statement, said he's training to kill.

(Video played.)

MR. WHITTAKER: It just shows him shooting. And for sake of time, I'm going to keep moving forward.

But also while here in Utah, on March 6, 2024, Tyler Thompson, his Google activity shows that he searched for "ak47 bullets." And on March 17th, he was searching for "best 9mm handguns."

On April 12th, his YouTube activity, Google YouTube activity, his query says that he searched for "how+to+dissasemple+a+fire+storm+1911 [sic]." Well, the evidence will show that Mr. Thompson unlawfully took a firearm outside of the United States to Africa, including the firearm that he declared through customs, a 1911,

Firestorm 1911.

In the next video, he's going to show you how he brought that firearm to Africa.

(Video played.)

MR. WHITTAKER: These are not individuals who were coerced into participating in this attack, these are individuals who willfully, knowingly, intentionally planned and prepared for an armed coup attack with the intent to kill the president of another country. Once they got to Africa -- that was in Johannesburg, South Africa, right after they arrived in Johannesburg, South Africa.

In Johannesburg, they also participated in firearms training. This first video shows Tyler Thompson at a shooting range in Johannesburg, South Africa.

(Video played.)

MR. WHITTAKER: The next slide, I have a video of Marcel Malanga at a shooting range. And the audio may be -- Kirsten may want to turn the volume down a little bit. It's kind of a loud -- there's loud music on it.

THE COURT: Where was this location again? Can you remind me?

MR. WHITTAKER: This is in Johannesburg, South Africa. And for sake of time, there's a whole series of these videos of them at this shooting range, Your Honor. A lot of shooting, and clearly where they're participating, we

know where it's at. I think it's called, "Dave's Shooting Range," or something like that. It's in the complaint affidavit. But it's well-known where they're at. It's located in Johannesburg, South Africa.

THE COURT: Did they go straight from Johannesburg up to Kinshasa?

MR. WHITTAKER: Then they went up through -- they took a flight from Johannesburg to Angola, and then they drove from Angola to the DRC.

THE COURT: How long was the drive?

MR. WHITTAKER: I don't know if we know that. It was -- it's a fairly long drive. I think some of the witnesses talked about how it was a long drive for them. But I don't know specifically.

THE COURT: Okay.

MR. WHITTAKER: Sorry.

THE COURT: No, that's fine.

MR. WHITTAKER: You'll notice on this video, it says, "T" -- he was in lane two, but he's added on the social media account "T 2 K." What we know that means is "Train2kill." We know that because he posted that earlier on his other social media account when he trained at a firing range here in Utah.

And then he signs it at the bottom "3XM." That's his name. That's his little signature that he goes, by

"3XM" or "Marcel Malu Malanga." I don't know if I said that right, but three Ms. His initials are "MMM."

(Video played.)

MR. WHITTAKER: I don't know if the Court heard the lyrics on that. But at the end, it says, "There's two people here, I want to kill them." And if you actually look up the full lyrics of this song, it talks repeatedly over and over about killing, killing, killing, F-ing kill. It's parental advisory, for sure.

THE COURT: Where was Christian Malanga during all of this?

MR. WHITTAKER: We don't know exactly where he was. We believe probably in the DRC. But eventually once they get to the DRC, they meet up with him. And I'm going to show the Court some videos with them engaged in preattack scouting of the attack locations. And Christian Malanga is with them. They're all together. Marcel, Christian, Tyler, and Ben are all together scouting out locations and planning the attack.

THE COURT: Did your investigation show Christian was with them, either in Johannesburg or in Angola?

MR. WHITTAKER: We don't have any evidence that I'm aware of that shows that Christian was with them in Johannesburg or in Angola. But we do know they met up with him in the Democratic Republic of Congo.

THE COURT: Got it. Go ahead.

MR. WHITTAKER: And then one final video from this shooting range I thought I would show. This shows them leaving the shooting range and talking about their experience there at the shooting range.

(Video played.)

MR. WHITTAKER: They had a successful day training there in Johannesburg. And Tyler is feeling much more comfortable with those firearms. In fact, if you're going to engage in an armed coup attack, you want to be able to be comfortable and be accurate with your shooting. And that's exactly what they're doing.

While they're in Johannesburg, they continue preparations to acquire the components needed to build those explosive devices.

On April 23rd, 2024, Marcel Malanga shopped for those 209 primers from Bass Pro Shops, just as Moesser had instructed him. You'll see the image taken from his iCloud account where he's shopping for those 209 primers. You'll see down at the bottom, it's a 100-pack of 209 primers. And on the second screen here, it shows they're 16.99.

Also on that same day, Tyler Thompson's internet activity shows that he searched for "blunderbuss gun powder nearby." When you look at that, combined with Marcel Malanga's iCloud account and his -- Marcel Malanga's iCloud

account on that very same day shows an image of "Blunderbuss Gun & Sport." And you'll see down where the address is, it's in Johannesburg, South Africa.

On the same day, on Marcel's iCloud account, there's a photograph of this S335, a medium-burning extruding propellant manufactured in South Africa and is a smokeless gun powder. This gun powder could be put into the previously discussed destructive devices to cause them to explode when detonated. Again, Moesser had instructed them to do this and to acquire that gun powder in Africa.

Also on the very same day, Marcel Malanga searched for "00 buckshot," as had been previously discussed with Moesser. And I'm sure the Court is aware, but when you add buckshot to an explosive device, it causes it to be much more lethal. And in fact, if somebody is near that device when it went off with buckshot in it, it would be a high likelihood that it would maim and kill somebody.

On May 4th, Tyler Thompson, from a Google YouTube query shows that he's searching for "congo+coup," "coup+in+niger" and "congo+coup+attempt." He's clearly thinking about a coup attempt in the DRC several weeks before the actual attack.

Members of this conspiracy engaged in preattack planning and scouting of possible targets. In Marcel's iCloud account, here's a screenshot that was found by the

FBI that shows an aerial view of houses in Kinshasa, Democratic Republic of Congo, along with handwritten directions identifying "Group 1," "Group 2," and "Group 3." And they point in which directions each group is going to go.

The FBI believes, after open-source inquiries in searching, that this was likely intended to be an attack on Jean-Pierre Bemba's house, Deputy Prime Minister of Transportation, who may reside on Pumbu Avenue. Which, as you can see, you can see Avenue Pumbu on that image.

Also, it's consistent with the other videos that they took as they are driving around Kinshasa, scouting out locations. They talk about attacking Bemba. So they had at least three targets. They had Mr. Bemba; they had Mr. Kamerhe, who is a high-level government official, and the president of the DRC at the White House. I'm sorry, I should have made that bigger for you earlier.

I'm going to play a video of one of those scouting-out videos. But what I'm going to do, it's a little hard to hear the audio, so I put some of the conversation here. And the male voice who is speaking is believed to be Christian Malanga. And he talks about -- they're talking about the plan and what they're going to do during the attack.

He says he really wants to get Kamerhe. As they

drive by, I'll show you in a minute in the video where they drive by Kamerhe's residence.

He says, "That's him, that's his guards. Do you see Kamerhe?...right there, that's his house right there...no resistance."

Another person in the car says, "So who lives here?"

A male responds, "U.S. ambassador...British Embassy." And you'll see in the video, they drive right into the British Embassy driveway and turn around. "Let's imagine this, we here...can someone pin this?"

Another male voice says, "Which WhatsApp are you using, Pres?" They're referring to Christian Malanga as "Pres" because they believe Christian Malanga is going to be the new president of the DRC.

Another male voice says, "Someone film in the back," as they drive past Kamerhe's residence.

Another male voice says, this is -- we believe it to be Christian Malanga, says, "We get Kamerhe in his house, then we come here, turn here...once we get that guy here, then we go straight...White House...now we rushing to go get our new challenge...they heard some gun fire...there's no radio...all communication has been cut," which Your Honor would remember from the affidavit that was filed, they had signal-jamming devices that they had purchased to use. "And

all those guys were handcuffed." And you'll see in the attack videos, Your Honor, I'll show the Court that some of them had those zip tie type handcuffs that law enforcement would use when they arrest somebody. They had those on their uniforms when they were attacking the White House. So they're talking about handcuffing people or kidnapping people against their will. And then it says, "So from there, then we come here to the White House. You need to get me here. That's your job."

I'm going to play the video, and I may stop to show the Court where Kamerhe's residence is.

(Video played.)

MR. WHITTAKER: Your Honor, right there where there's the yellow awning thing and then there's several individuals standing outside that blockade, that's Kamerhe's residence. Those are some of his security guards right there. And then they're driving by his residence to see where it's located.

(Video played.)

MR. WHITTAKER: You see, Your Honor, they're going to turn around there by the British Embassy and drive back down by Kamerhe's one more time.

(Video played.)

MR. WHITTAKER: So he said they're going to get Bemba then Kamerhe.

(Video played.)

MR. WHITTAKER: So for points of reference, he's saying, "You need to get me here. You need to get me to the White House."

Off on the left-hand side of the screen is a mausoleum. You see that, with a gold star on it? Right across the street from that mausoleum is the White House. I was going to show them get out of the car here in a minute, and we'll have one more video that will show them walk and scout out that location.

(Video played.)

MR. WHITTAKER: Okay. The next video in a minute will show who gets out of the car.

But for points of reference, here's a map. You can see the British Embassy on there, approximate location of Kamerhe's residence. And then up at the top, you'll see the mausoleum with a red [sic] star, and then the Palace of the Nation, or the White House.

You can see the approximate route which they traveled in that video. You can see they drove past Kamerhe's residence up to the British Embassy. They turn around, and then they drove down this boulevard at a high rate of speed, saying, "That's our plan. It's going to be nighttime. There will be no radios." And, "You gotta get me to the White House."

I stopped the video part of the way through, but this black gate is important. Because when they commence the attack against Kamerhe's residence, that black gate was shut. And they took an SUV-type vehicle and rammed it into the gate backwards to get the gate open. And then you'll see here in the photograph there are several of Kamerhe's, what's believed to be his security guards or his security forces there at his personal residence.

The next video, as I explained, it has them scouting out around the mausoleum and the White House. And it's a long video. It's about nine minutes. I'm not going to play the whole thing. I just want the Court to be able to see that all the defendants were there together. In part of that conversation, you can -- Thompson can be heard telling Christian, "Theoretically, if it's not bad, I would be able to park in between the White House." And then Thompson says, "I would be able to fly over it." But we know, the evidence has shown that Tyler Thompson is to be the drone operator. He's the one that flies the drones. So he's explaining to Christian how he can fly that drone over.

And Malanga says, "And follow."

Thompson says, "Yeah, over all the cars and everything on the way to the White House."

Malanga says, "Yeah, when we have them, though, are we going inside with them?"

And another person says, "We will get the gun easy."

Another male says, "That's the president's office."

Other interesting fact, and I'll tell the Court that when this video in its original format was taken off of Marcel Malanga's iCloud account, it's upside down. So it's like he's carrying his cell phone upside down, as not to be detected when he's video recording this. So for convenience, the United States has turned the video right side up so that it can be more easily viewed. But in its native format, it's actually upside down.

(Video played.)

MR. WHITTAKER: That's Christian Malanga in the white shirt. That's Tyler Thompson in the gray shirt. And Ben Polun in the blue shirt and jeans. And Marcel is videotaping this.

(Video played.)

THE COURT: Who are the others there? Do you believe those are the bodyguards that were trained at Mr. Moesser's house?

MR. WHITTAKER: They're other members of the conspiracy. In the maroon shirt, his name is Youssouf, and he was one of Christian Malanga's friends and participants in the armed coup attack.

There are several others in there who I think the FBI knows who they are, but I may not be able to answer that question off the top of my head. We would call them all "unindicted co-conspirators."

THE COURT: All right.

MR. WHITTAKER: I'm sorry, I went too far ahead there. I think to forward this, I'm going to have to get out of this -- out of here and just play it like this. I'm sorry.

THE COURT: It's all right.

MR. WHITTAKER: You'll see the White House there across the street.

(Video played.)

MR. WHITTAKER: I'll probably stop it there for time purposes.

But you can see they are almost making fun of, like, how easy this is going to be, because there's one of the security guys, like, asleep on the job. And they're, like, this is -- they're kind of laughing about it, thinking this is going to be easy.

And we'll move to the night of the attack. As they began their attack, one of their vehicles had a problem, and they needed an additional vehicle to move the rebel forces towards their targets. And Christian Malanga murdered an innocent civilian. And in the United States, we

would call it a "car jacking." But they pulled up in front of this car, and at point blank range, shot and killed the driver and car jacked his vehicle.

The individual was in the car with his girlfriend, who watched her boyfriend die that night on May 19th. And the evidence in the case says that it was Christian Malanga who pulled the trigger.

Here's two police photographs that were taken by the DRC of Kevin Tamba, who was the innocent victim that was driving the car that night. You can see the blood pools around his head. He was shot in the head and pulled out onto the street, and they took his car.

These rebel forces also kidnapped and murdered individuals at Kamerhe's residence. This video that I'll show is the morning after the attack of Kamerhe's residence. There's no audio. But at approximately 4:30 a.m., Christian Malanga and his rebel forces traveled to Deputy Prime Minister Kamerhe's residence. Christian and his men entered the home and exchanged gun fire. Two guards and one of Christian's men were killed.

As I indicated before, they used one of those SUV vehicles to ram the gate several times in order to get access to the residence. And you'll see in this video, there are vehicles that have bullet holes in them, and the house is riddled with bullet holes. Kamerhe, thankfully,

was not home and was not injured, but two of his security guards died.

(Video played.)

MR. WHITTAKER: You can see the bullet holes in the house there. Bullet holes there. Bullet holes through the window.

THE COURT: Did your investigation identify the individuals that were with Christian Malanga when they went to this residence?

MR. WHITTAKER: There is a DRC witness, at least one, that identifies Christian Malanga and Youssouf that were there. That same witness also indicated that there were two drones that preceded the attack. So there were drones in the air during the attack.

Over here, you see the black gate on the right, and one of the dead security guards there in the doorway. You'll see a trail of blood that goes out into the street here. It's believed that that was the one soldier from Christian Malanga's rebel army that was shot and that he was dragged down there and out into the street and loaded into a car and driven off with the rebel forces.

Here's a second security guard that was shot and killed outside Kamerhe's residence.

And then another picture of both of those deceased individuals who were protecting the Kamerhe residence from

this armed coup attack.

That is the one security guard out in the front that was, the morning after the attack that was killed by -- he was killed by the rebel army.

At this point after going to Kamerhe's residence, they proceeded to the White House, just as they had planned to do and scouted out several weeks before.

At approximately 5:00 a.m., Christian and the rebel forces traveled to the Palais de la Nation, or the White House. They began filming and live-streaming the action that was happening there at the White House.

(Video played.)

MR. WHITTAKER: So on the left of the screen, that's Marcel Malanga. That's Christian Malanga in the red hat in the center of the screen. And Tyler Thompson, you've just seen put something in the backpack in the back of Marcel.

You'll also see here on Marcel as part of his equipment that he has -- I mentioned those zip tie handcuffs before -- you can see those right there around his waistband. They were carrying those in order to kidnap and apparently arrest other individuals that stood in the way of their attack.

(Video played.)

MR. WHITTAKER: And right in the background, right

behind Christian in the green hat, the shorter individual, that's Youssouf, who the Court had asked about in the previous video.

(Video played.)

MR. WHITTAKER: What the FBI had also learned, Your Honor, is that when Marcel, in this video -- one of the witnesses they had talked to, when he was putting that thing up over his mouth and nose, he had just gotten off the phone with his younger brother, Brady, and was basically saying goodbye. He thought that he was going to get killed during the attack and was trying not to show his emotion there. But he was concerned that he may die during this attack because things may not be going as they had planned.

(Video played.)

MR. WHITTAKER: So when he's shouting, "Felix, you're out," Felix is the first name of the president of the DRC. He's shouting, "Felix, we're coming for you. Felix, you're out."

(Video played.)

MR. WHITTAKER: And right there on the ground, there appears to be another dead body, although we can't confirm that. But it appears that that individual has been shot and/or killed because he never moves during the entire filming of the live-streaming of the attack.

(Video played.)

MR. WHITTAKER: That flag, Your Honor, is the flag of the New Zaire, what they intended the country to be called after they thought they would be successful in overthrowing the government. That was the new flag they wanted to use and call it the "New Zaire."

(Video played.)

MR. WHITTAKER: I have a couple more videos. I'm going to skip this middle one. I'm going to go to the last one.

This last one, this is the last one in the series of attack live-streaming videos. You'll hear at the end of this that someone gets shot, and then they all scatter and flee. And then we believe that that's when the DRC military or DRC government forces came and were able to arrest everybody that participated in this armed coup attack. Christian Malanga was shot and killed during the attack.

(Video played.)

MR. WHITTAKER: Marcel was talking about needing to get those Uzis working. There were Uzis that were recovered by the DRC forces from the rebel army. They're using automatic weapons as part of the attack.

(Video played.)

MR. WHITTAKER: You heard right there at the end someone in English says, "I'm shot." The only person -- I know it's unconfirmed -- the only person that we know that

got shot was Christian Malanga. And, in fact, on Christian Malanga's Facebook, it was posted these pictures of him the morning after the attack.

That's all the evidence I brought with us today.

In summary, Your Honor, the nature and circumstances of this offense are extremely serious, violent, and brutal. Those facts outweigh all of the other facts to show that these defendants should be detained, that they're a danger to the community. They're a risk of flight. They face multiple counts, serious, serious counts. They face life sentences.

There are people that -- multiple people that died. At least six individuals were killed during this attack.

This was planned for months in advance. Substantial steps were taken in the United States, in Johannesburg, and in the DRC. Multiple countries. And not only was this just violence, but it was violence to overthrow a foreign government, to kill the president and high-level government officials. Those facts in and of themselves would warrant detention.

I'll let my colleagues address the individual history and characteristics of the defendants. Thank you, Your Honor.

THE COURT: Thank you.

MS. SENANAYAKE: Thank you, Your Honor.

Would Your Honor prefer that we cover the individual history and characteristics of each defendant before moving on? At one point, Your Honor had indicated doing individual hearings for each defendant.

THE COURT: I think it's best just to address them all three right now, if that's okay.

MS. SENANAYAKE: I'll do that. Thank you.

So I'll begin with Mr. Malanga, Marcel Malanga. Here, defendant poses an extreme danger to the community. And there are no conditions or combination of conditions that could assure Mr. Malanga's appearance or the safety of other people in the community. I'm going to be going through a few different factors of individual characteristics, beginning with family, community ties.

Mr. Malanga had no stable place of residence and, as such, he poses a severe flight risk. He had no stable housing prior to leaving for Africa in April of 2024, and he has no sufficient family network that would keep him grounded and here in this district.

His biological mother had requested that Mr. Malanga leave her house prior to April of 2024, when he left for Africa, due to a disagreement between Mr. Malanga and his biological mother. And before this disagreement, Mr. Malanga lived with his mother only from 2023. Prior to

that year, he had very little contact with his biological mother and lived away from her.

What the government is aware of is that she has very little control over Mr. Malanga and also has, at times, a very hostile relationship with the defendant.

Now, when Mr. Malanga left for Africa, he was actually living in Mr. Thompson's bedroom in Thompson's house.

None of Mr. Malanga's friends or family members who live in Utah and who were interviewed by federal agents could prevent him from engaging in any of the conduct, the premeditation, the planning here in Utah. Several indicated to federal agents that they were concerned for him, but none were able to stop him.

Mr. Malanga also has a half brother who lives outside of this district who he is close with. And we believe that he may flee to the state of his brother's residence if he is released.

In terms of his employment, Mr. Malanga also lacks any sort of stable employment, which again, underscores his flight risk here. He has no current employment and has been unemployed for at least a year since he has been in Africa. He also has no long-term employment that could motivate him to stay in Utah, and, as such, his flight risk is high. Family members told federal agents that they've been

collecting money and sending it to the Democratic Republic of the Congo. But one family member, who actually provided the bulk of these payments and financial support and helped to coordinate the financial support within the Malanga family, told agents that he could not afford to do so any longer.

In terms of foreign ties, again, Mr. Malanga presents a serious flight risk. He has extensive family ties outside of the United States. His stepmother and stepfamily still live in Africa. He has visited them with some regularity in the past, and he could easily be motivated to flee to Africa to live with them to avoid criminal prosecution in the United States. And as my co-counsel mentioned, the charges here are extremely serious.

Also, when Mr. Malanga was removed from the DRC by FBI, he told FBI agents while on the flight that they should have left him in the DRC. This indicates that he would have rather taken his chances in the DRC system than come back here and be prosecuted for his crimes. And again, this underscores his flight risk.

In terms of criminal history, we're not aware that Mr. Malanga has any relevant criminal history. But in 2022, he did fail to appear for a hearing in Orem, Utah, and a warrant had been issued for his arrest.

But to summarize, we don't believe that any of Mr. Malanga's background history or characteristics weighs in favor of release.

THE COURT: Let me ask you a couple questions. I received the update from Officer Ponder. It looks like he has some skills that would make him employable. Do you disagree with that?

MS. SENANAYAKE: We understand that he used to work in construction and may have some skills in that field. That said, he has no long-term employment or career skills that we believe would weigh in favor of his building a career here in the district.

THE COURT: The proposed residence is with an aunt and grandmother. Do you have any specific concerns regarding them?

MS. SENANAYAKE: Yes. The government is aware that -- sorry, there's some feedback.

The government is aware that those family members may have been involved in receiving or sending packages to the DRC, and they had assisted Mr. Malanga with moving some of the items to the DRC to further the coup attack. So we do not believe that that placement with those family members would be appropriate.

THE COURT: Do you believe a GPS monitor or tracking device would adequately address risks of flight?

MS. SENANAYAKE: We do not. Again, here, Mr. Malanga has extensive ties, both outside of the United States but also in other districts. And overall, what Mr. Malanga has shown repeatedly in his conduct within Utah is that he was willing to kill in order to achieve his ends in another country. And in the end, we believe that completely outweighs any sort of conditions or conditions -- combination of conditions of release.

THE COURT: Do you have his passport?

MS. SENANAYAKE: I believe we do have his passport. He was issued a temporary passport upon release from the DRC, but I believe we do have the temporary passport.

THE COURT: Okay. Thank you. Anything else on Mr. Malanga?

MS. SENANAYAKE: No.

THE COURT: All right. Let's go to your next one. Do you want to start with Mr. Thompson or Mr. Moesser?

MS. SENANAYAKE: If I may, I'll start with Mr. Thompson.

THE COURT: Go ahead. That's right, Mr. Stowers is doing Mr. Moesser. I'm sorry.

MS. SENANAYAKE: That's okay.

So here, the government acknowledges that Mr. Thompson has significant family ties and community ties.

And as Your Honor, I'm sure, can recognize, this courtroom is full with family members.

That said, these family members were completely unaware of Mr. Thompson's conduct in Utah for months. He engaged in serious premeditation and planning. For instance, he was considered a soldier and a drone specialist, and he was meant -- records show he was intended to be the operator of the drones for the coup attack.

There are several videos, some of which Your Honor saw, at Mr. Moesser's house. And Mr. Thompson is in at least one of them. In these videos that Mr. Thompson can be seen in, there are discussions about how to make the devices more lethal, how to increase fragmentation from the bombs that Mr. Moesser was building.

In addition to that, there were discussions about using powder and double-aught buck to make the bombs more lethal.

Mr. Thompson and the other defendants and co-conspirators also practiced installing the flamethrower on the drone. And as Your Honor saw from videos, that flamethrower attachment then was seen in Mr. Thompson's house in a box. And he's the one who, then, unpacked it.

Mr. Thompson had a firearm that the government believes he procured from Mr. Moesser. It was a 1911 FireStorm .45 caliber, and we have customs records showing

that Mr. Thompson took it to South Africa.

And we also know that Mr. Thompson tested the drones at his own house. And yet, his mother, who was living with him, his brother, who was living with him, none of them -- neither of them knew about any of this activity.

We know that while he was in Utah living with his mother, Mr. Thompson was conducting internet searches about finding cheap AK-47 stock, body armor plates, flamethrower drones, and other searches that my co-counsel had run through.

We also know that Mr. Thompson emailed the flamethrower attachment vendor and attempted to actually procure the flamethrower attachment and that it was, then, located at Mr. Thompson's house.

And yet, the family members told FBI very soon after the coup -- in fact, I should say Mr. Thompson's mother told FBI that she had no idea where her son got the equipment, gear, or weapons from, and that her son had never expressed an interest in the Democratic Republic of the Congo. Both Mr. Thompson's brother and his mother told FBI agents and us that they were completely unaware of the steps that Mr. Thompson had taken in his own house while living with her.

To end with the factors, Mr. Thompson also has no current employment, and he's also been unemployed for a

year. I do see in the pretrial services report that his parents have offered employment. You know, what, I think, the government would argue is that here, there are, again, no conditions or combination of conditions that could assure his appearance, despite the potential employment with his parents.

One, again, there was a significant period of preparation and planning here that occurred in Utah. And family member after family member of Mr. Thompson's told the government repeatedly that they really had no idea this was taking place.

In addition to that, Mr. Thompson's mother also told federal agents that, while Mr. Thompson shared many parts of his life with her and had regular contact with her, he was also an adult and he did not share everything with her.

His brother told agents that he had no idea that either Mr. Thompson or Mr. Malanga, while they were living in Mr. Thompson's house, had been planning the armed coup attack, and despite being asked to purchase specific items for Mr. Thompson and Mr. Malanga. So Mr. Thompson had been successful, along with Mr. Malanga, in concealing that criminal enterprise.

Another point I think that we'd like to underscore here is that we anticipate Mr. Thompson may argue that he

was under duress. And we understand from public reporting of the trial in the DRC that he had stated that he did not know about any of this happening until that night. He told the DRC court, "To my knowledge, we were here on vacation to meet him," Christian Malanga, "so I did not see him as a threat."

However, as Your Honor now has reviewed some of our evidence, in fact, in Thompson took significant steps in Utah while Mr. Christian Malanga was actually not in Utah and nowhere around here, that the government is aware. His conduct, his actions, both in Utah and in Africa, beginning from months prior to the coup attack, really contravene these assertions of duress.

So, you know, in summary, we would argue that there really are no conditions or combination of conditions that could assure safety of the community or the appearance of the defendant.

THE COURT: Do you have the same concerns with risk of flight regarding Mr. Thompson that you have with Mr. Malanga? I mean, all his ties seem to be in the district, right?

MS. SENANAYAKE: So far that the government is aware, we believe that all of his ties are within this district. We're not aware of any family who live outside of the United States in the same way that Mr. Malanga has

family.

THE COURT: And it appears that you concede that he's employable?

MS. SENANAYAKE: Yes.

THE COURT: Okay. Thank you. Anything else on Mr. Thompson?

MR. WHITTAKER: No. Thank you, Your Honor.

THE COURT: Mr. Stowers, let's talk about Mr. Moesser.

MR. STOWERS: Thank you, Your Honor.

Your Honor, in addressing the history and characteristics of Mr. Moesser, the government recognizes that Mr. Moesser has some positive factors, such as the length of time he's resided here in Utah, the length of his marriage, the fact that he has other family members close by, his age, and his health.

But on balance, Your Honor, the negative factors far outweigh Mr. Moesser's positive factors, and they strongly support the government's position that no condition or combination of conditions can reasonably assure Mr. Moesser's appearance or the safety of other people in the community.

In addressing Mr. Moesser's family and community ties, it appears that Mr. Moesser's family and associates either turned a blind eye or completely ignored the fact

that he was engaged in a criminal conspiracy here in Utah.

The evidence shows that members of the conspiracy met at Mr. Moesser's residence on more than one occasion. The drone, the flamethrower, the explosive devices were laid out on Mr. Moesser's kitchen table. The evidence suggests that he designed and built these explosive devices at his home, and went so far as to call his design "ingenious."

He had explosive device prototypes lying on his bedroom floor and throughout his machine shop and hidden in his yard for what would appear at least a year since his co-conspirators traveled to Africa.

During a search of Mr. Moesser's residence, FBI agents found evidence to show that his release would pose a danger to the community, Your Honor. Agents found a hide space in Mr. Moesser's bedroom that's accessed by a ladder in his closet. They found multiple firearms and ammunition at the base of that ladder. Agents also found a hidden storage room and a gun range in his basement that is accessed through a secret hide door.

In total, agents found hundreds of firearms and thousands of rounds of ammunition hidden and in plain sight within Mr. Moesser's residence.

Your Honor, when you combine this information with the evidence that shows that he provided firearms and built explosive devices to be used in the armed coup attack, it

supports the government's position that he clearly poses a danger to the community.

He also lied to federal agents, Your Honor. And it goes directly towards his trustworthiness. When interviewed by agents upon his arrest, he told the agents that he had disposed of the destructive or explosive devices that he had built to be used in the armed coup attack. Agents later found those explosive devices hidden in his goat pen, as you saw earlier in some of the pictures. And a short time later, Mr. Moesser admitted to the FBI that he had lied about that fact.

It's important to highlight that agents also found additional evidence in Moesser's residence that shows he's both a flight risk and a danger, Your Honor. They found several books inside of his residence. And I'll highlight just a few. One is titled, "Total Resistance." One is titled, "The Escape Bag Blueprint." One is titled, "Operation Blackout," and it indicates on the cover that it includes how to turn your home into an impenetrable fortress. And the final one, I would note, is titled, "The Patriot's Guide to (Legally) Hiding Your Guns from the Government...So They Don't Know They Exist and Can Never Confiscate Them."

And so while the government did seize hundreds of firearms and ammunition from his residence, at this point we

can't be sure that they've all been seized and that there aren't more hidden there at his residence.

Your Honor, in short, in terms of Mr. Moesser's family ties and community ties, the evidence did not suggest that his family members or his friends could stop him from fleeing or from engaging in future criminal conduct.

In terms of his age and physical health, I would just highlight that one week prior to Mr. Moesser's arrest, he traveled alone and internationally to Africa and participated in a crocodile hunt for several days. This fact indicates that he is capable of traveling, that he's independent, that he's still physically fit enough to engage in a crocodile hunting expedition. So it clearly shows he's still capable of manufacturing destructive devices or using a firearm.

In terms of his employment, Mr. Moesser's been unemployed for several years. The presentence report -- or the pretrial report indicates that he's been retired for a few years, so there would be no loss of a career if he were to flee.

And he has significant foreign ties, Your Honor. He has a U.S. passport. To my knowledge, the FBI did not seize that passport. And he has extensive international travel experience to places like the Dominican Republic, Mozambique, New Zealand, South Africa, South America, Spain,

Tunisia. And I would note that many of those were for hunting trips to South Africa. And so he, presumably, has a network of friends and associates that he's gathered during those travels, Your Honor.

In addressing his criminal history, I would note he has five DUI arrests that resulted in at least four convictions. The fifth, the status of that is unknown. The most recent was in 2013.

And then, significantly, I would highlight in 2009, as Mr. Whittaker highlighted, he was charged in this court originally with four counts, four felony counts: Attempted placement of an explosive on an aircraft, possession of an explosive at the airport, unlawful transport of hazardous material in the air, and a false statement to federal agents.

The case was finally -- it was pled down to essentially concealing dangerous items in his checked baggage. But I would note that in his plea agreement, Mr. Moesser stipulated to trying to take black powder onto a flight from the United States to South Africa, and then lying about it to federal agents. This goes directly towards his trustworthiness, Your Honor, and also shows that he used that experience, specifically flying with black powder, later in the conspiracy when he constructed these explosive devices but was able to advise his co-conspirators

not to ship them -- or fly with them with black powder.

He also has a conviction from 2014, where he was convicted of discharge of a firearm. And then in 2016, originally he was charged and convicted of three felonies, receiving or transferring stolen property, selling or buying a vehicle without ID, and providing false and misleading information to law enforcement.

Your Honor, those were later pled down to Class A misdemeanors. But I would note, again, those go directly to Mr. Moesser's trustworthiness. And the evidence indicates that he lied to the detectives when they were investigating a trailer theft that Mr. Moesser appears to have originally reported, and then it was later discovered that the trailer he was reporting stolen was actually stolen by him, and he was convicted in a jury trial in that matter.

Your Honor, in conclusion, it is the government's position that no condition or combination of conditions could assure Mr. Moesser's appearance here in court or protect the community if he were released.

His criminal history, his FBI interview show that he's not trustworthy. It shows that he very much premeditated in conspiring with these individuals. He was aware of what was going to take place in the Congo. In fact, he intended to be there, to be present, and had airfare purchased for that purpose.

I would just highlight and Mr. Whittaker also highlighted that there were some communication-jamming devices that were discussed during one of the videos. And there's evidence to show that the defendants acquired that device. There's evidence that Mr. Moesser provided information and even some examples that he was able to find over the internet to Christian Malanga on how to acquire and use communication-jamming equipment.

So with that, Your Honor, we'll submit and ask that the Court hold the defendants detained.

THE COURT: A couple of questions. Has your investigation revealed the reason that he didn't travel to Africa to participate in the alleged coup?

MR. WHITTAKER: Your Honor, at this point, it's not clear. It is clear that he had a ticket and was scheduled to travel with Marcel and Tyler. There's some evidence that he also had a vacation planned to the Dominican Republic with his wife during that time. However, there's evidence of him photographing his passport, for example, and sending it to some of the other defendants to arrange for his travel. But it's just not clear exactly why he didn't travel at that time.

THE COURT: Was he in the United States, then, on the date of the alleged coup?

MR. WHITTAKER: I believe he was, yes.

THE COURT: What about the room where the firearms were? Not in the closet in his bedroom, but the separate room. Did he disclose that, or was that found just by agents through the search?

MR. WHITTAKER: No, that was found by agents during the search. And if Your Honor recalls, the government submitted a subsequent search warrant once that hide room was detected to cover that portion of the search. It was not disclosed by Mr. Moesser during the interview.

THE COURT: Thank you. We've kept everybody here for a long time. Do you mind if we take five minutes? And then we'll come back and then hear arguments from defense counsel. We're off the record.

(A break was taken from 3:48 p.m. to 3:57 p.m.)

THE COURT: Back on the record.

Ms. Stirba?

MS. STIRBA: Your Honor, may I speak from the podium?

THE COURT: Of course.

MS. STIRBA: Thank you.

Your Honor, we are asking the Court to release Mr. Malanga to a verified residence that we have provided pretrial services.

THE COURT: Let's turn that volume down just a bit, Kirsten, so no feedback.

Sorry, Ms. Stirba. Go ahead.

MS. STIRBA: I do want to start with this address, because I respectfully believe the government is conflating addresses when the government expressed concern about this particular one.

On page 9 of the complaint, there is a statement that, an allegation that Mr. Malanga had items shipped to an address in Draper, Utah. That is not the address that we are proposing. Ours is in West Jordan, Utah.

And I respectfully submit I don't believe there is any evidence connecting these two family members to shipping anything to Mr. Malanga during this time. That is not my information, and I would actually ask for a much more specific proffer if the government believes that's the case, because I don't believe it is.

THE COURT: Okay.

MS. STIRBA: I would also point out that, to the extent there is the government's belief that a family member did ship something to Mr. Malanga, the items enumerated in the complaint are not those that raise any kind of an eyebrow: Battery chargers, adapters, a microphone, and a GoPro camera. In other words, none of those are items that in any way curl a hair or suggest nefarious intent, and certainly don't show knowledge of any kind of assaultive conduct, an attempted coup, or aiding somebody with that

venture. So I don't think the government's concerns about this address that we are proposing are correct.

This is the home his grandmother owns. She has lived there for almost 20 years. Mr. Malanga, himself, has lived in that residence for large parts of his upbringing. His grandmother lives there with her daughter, Mr. Malanga's aunt, who works and is a college student at the U. He would have his own room.

And as part of our proposed release plan, we would be asking the Court to impose location monitoring, home detention, reporting conditions. And both Mr. Malanga's aunt and grandmother have agreed to be third-party custodians for this release plan. I will discuss how that matters in a little bit, but that is our overall plan for the Court.

Your Honor, this case is a jaw-dropping outlier in Mr. Malanga's life. People have expressed shock, confusion, and astonishment by Mr. Malanga's alleged involvement in this offense. He was 21 years old at the time of these allegations. He was born and raised here in the Salt Lake valley. He has no prior criminal convictions. He has zero prior history of violence. He has zero prior history of political activism, let alone extremism. He had never before been to the DRC.

Instead, Mr. Malanga had grown up with an ordinary

experience of a student athlete. He graduated from Copper Hills High School in June of 2020. He played football while he was in high school, and he got a partial football scholarship to Southern Virginia University. He went there and attended for a semester in the fall of 2020. Unfortunately, that also meant that Mr. Malanga was the first incoming class to deal with the very height of the COVID epidemic. And it was a very difficult experience for him, for everyone.

The football season was canceled, he had to deal with online courses, and it wasn't the experience he had hoped it would be. So he returned to Utah after his first semester, and he worked in construction work.

I have spoken to two of his previous employers, the most recent of which employed him from January of 2024 until he left for the DRC. So true, I understand the government's point, he was not employed in the past year that he was incarcerated in the Congo. But prior to that, he was. His employer confirmed that he worked full time. He was an excellent worker. He was actually grooming him to be a lead. And he said that while he can't say yes, he would employ him if released, he is open to talking about that possibly if he had a space.

THE COURT: That Will Steed or Fullmer Brothers?

MS. STIRBA: That's Will Steed. I also spoke to a

representative from Fullmer Brothers.

THE COURT: Okay.

MS. STIRBA: Who, that employment was more episodic. It was more as things came up on various construction projects. But he also confirmed that Mr. Malanga was 100 percent reliable and worked extremely hard. His work ethic is impeccable, and I've confirmed that.

He also, when he returned to Utah, volunteered coaching football for elementary school kids. I've also spoken to the defensive coach he worked with while he was doing that, and that coach verified that the kids, who were approximately ten years old, adored Mr. Malanga.

As the Court knows, the amount of evidence to rebut a presumption is not high. We just have to provide some evidence. At a minimum, we submit that Mr. Malanga's lack of prior convictions, educational history, and ties to the community rebut that presumption. And the government cannot and has not met its burden to show that he must be detained in this case.

I'm going to go through the factors in the BRA. But I do want to say this before I start talking about the nature of the offense. The defense teams in this case have not yet received initial discovery. That drive was mailed to our discovery coordinator on Friday. She received it

yesterday. She was then doing a security scan, and then she has to make it usable for us. So we have not had a chance to see any of it. The government did provide a number of exhibits yesterday in anticipation of this hearing, but not everything that was presented today.

So I say that, in discussing the nature of the offense, I'm going off of what I have received so far. But that is not everything. And should something arise, you can bet you will hear back from me.

So in terms of the nature of the offense, the dissonance between Mr. Malanga's life and these allegations is staggering. It becomes only remotely comprehensible when we look at the reason that Marcel Malanga was in the DRC in the first place. On this point, I don't think there's any dispute.

What happened that night was the product of a grandiose vision of his father, Christian Malanga, who led the attack. Marcel Malanga would never have been there but for the influence of his father. And to understand this influence, I have to talk a little bit about Marcel's upbringing, because it matters.

THE COURT: Was Christian -- in my understanding, he entered the United States as a refugee from DRC; am I wrong on that?

MS. STIRBA: That's correct. In 1998, yes.

THE COURT: 1999, refugee entry.

MS. STIRBA: 1998.

THE COURT: Ninety-eight. Thanks.

MS. STIRBA: He then met Mr. Malanga's mother at Highland High School. They were teenagers when they had Mr. Malanga, and they separated when he was approximately six or seven years old. His mother continued to live here in Utah, and Christian Malanga began to travel internationally and live large parts of his life abroad. And he spent a large part of Mr. Malanga's childhood and upbringing away from this country.

In those years, when Mr. Malanga -- and I mean Marcel Malanga -- was a child, Christian Malanga was pursuing this dream of becoming president of the DRC. He ran for office. He established a political party. He developed a government in exile and declared himself president of it.

THE COURT: He ran for office in DRC?

MS. STIRBA: Yes.

THE COURT: What year was that?

MS. STIRBA: 2011. Approximately 2011.

THE COURT: So had he returned? Had he had permanent residence in DRC by that time?

MS. STIRBA: I don't know exactly what his legal status was, but he had returned. He was actually imprisoned

for a time, and then he left the DRC.

THE COURT: Had Christian Malanga naturalized as a United States citizen?

MS. STIRBA: No.

THE COURT: So he was a refugee. I assume he got his permanent residency?

MS. STIRBA: I don't know the exact -- yes, I believe he did. But he had not come back sufficiently to maintain those ties, is my understanding. So by the time Marcel Malanga was in his teens, his father wasn't coming back at all. In fact, I don't believe his father personally returned to the United States since about 2016.

THE COURT: Thank you. Sorry to interrupt.

MS. STIRBA: These absences left his son, Marcel, who was a child and clearly adored his father, eager for his father's attention and approval. And this is the exact dynamic that we see in how these events allegedly culminated in 2024, with Christian as the clear leader and Marcel following his direction. We see that in the evidence proffered in the government's complaint, where Marcel identifies himself as staff to his father. We see that in the video evidence we just saw here in this courtroom.

It was Christian Malanga leading the charge front and center. And critically, it was also Christian Malanga leading the violence. Yes, Marcel Malanga was there, and

yes, you can see that at the Palais, he's holding a gun. But granularity is important. And the Court actually asked the government a question that is a hole, which is the government has not proffered any evidence in this hearing that Marcel Malanga fired any shots at the Kamerhe residence. There's no evidence whatsoever that any explosives were used at any point. And there is no evidence that a flamethrower with a drone was ever used at all. In fact, it is my understanding that that drone was actually recovered from a hotel room. It never made an appearance on the stage at all.

There's a reference in the complaint to another drone that may have been used for surveillance or intended surveillance, but not the one throwing a flamethrower at all.

To the contrary, the video evidence from the Palais shows Marcel Malanga looking wide-eyed, dazed, and scared. And he is following the call and response of his father. This role as a follower bears directly on whether Marcel Malanga is manageable in the community.

And in addition to this evidence, we also see one other part of the nature of this offense which really does matter, the "why" of it, the reason Marcel Malanga so admired his father and followed his lead. And we see this in just what's been proffered today.

The DRC has long been a failed nation state of horrific violence and rape and corruption. The scale and extent of human suffering in that country is truly immeasurable. And even in the complaint, it's clear how Marcel understood his father's efforts to become president and what vision his father was trying to pursue. It wasn't a craven warlord, it wasn't pursuing power for power's sake. It was to help and free the people of the DRC. And that matters as the Court considers whether Marcel Malanga is releasable.

Now, the fact that Christian Malanga chose to involve his son in this grand plan is a tragedy. There's no other word for it. I know today is not the day to address the full extent of that tragedy, but this is what is important for the Court to consider in assessing the nature of the offense. One, the BRA does not establish per se detention for anything, no offense, no matter how serious. It contemplates possible release, even for the most serious of charges. And that's why these specifics I've been talking about matter.

Two, that influence is gone. Mr. Malanga's father died that night. So even taking this case completely at face value and crediting everything the government has said in its complaint and presentation today, Mr. Malanga is manageable because the motivating force is not present

anymore.

What remains is what the Court sees in this courtroom today with the people who are here, the friends and family and community members who want nothing but the best for Mr. Malanga and will help him scrupulously comply with conditions of release.

So next, in terms of the weight of the evidence, again, we're not in a good position to address this prong because of the information we do not have yet. But of course, the government is correct in its pleading that this is the least important factor, because otherwise it would be tantamount to a finding of guilt, which is not compatible with our system. So we would ask the Court not to give too much credit or undue credit to this factor, especially not before we've seen discovery, which we expect to complicate this picture.

So third, I want to talk about the history and characteristics of Mr. Malanga, which we submit unquestionably show that he's releasable. The government is correct that, in citing a case, that there is a case that says the sheer weight of evidence can, in some cases, override a history and life experiences. I'm sure that is notionally true, and I'm sure in some specifics that's true. But that depends on the history that's presented, and it is not -- and release is warranted with the history like this.

Mr. Malanga's ties to family and community are as deep as they come. I respectfully but adamantly disagree that he is a risk of flight. He is a life-long resident of Utah, with the exception of his semester in college. This is his home in every sense of that word. He grew up here. He was educated here. He worked here. His closest family is here, his mother, his siblings, aunts, uncle, friends so close they might as well be family. And he has a remarkable amount of community support. He absolutely has the stability and support to appear for court dates.

Now, the government has submitted that this case, itself, gives Mr. Malanga an incentive to flee. I think when examined closely in this case, that argument just doesn't ring true. As a practical matter, the government seized his passport. He will not be getting a new one. As a personal matter, Mr. Malanga would never put his family through that kind of pain. He has seen the impact of this past year on them, the financial, the emotional, the physical. And he knows that his grandmother and his aunt are putting their own skin in the game by offering to be third-party custodians. That imposes a significant moral obligation on his part. He loves these family members. And he would never inflict pain and jeopardize them, their own lives, by doing something as foolish as fleeing.

And then lastly, we cannot separate this hearing

from the year, almost, that Mr. Malanga was detained in the DRC. Because that year has made clear that he has every intention of staying right here in this country. His time in the DRC was horrific. He was beaten and tortured. The prison conditions were appalling. He is just beginning to get medical care for the physical aftershocks that still remain, the injuries, the diseases, the parasites. And he was sentenced to death in the DRC. Now, I understand that sentence has been commuted. He's here.

But that experience is the kind that haunts you forever. It was terrifying. And the fact that it's gone, that sentence has lifted does not erase that terror. So Mr. Malanga, more than anyone, knows that the potential consequences he faces here are far less dire than those he may face if he were to leave this country and put himself at risk of being even close to that experience again.

Now, the government did point out that in the dismissed minor in possession of alcohol charge, there were two warrants issued in that case. But I just have to respond, because that case could not be more of an apple, and this case could not be more of an orange.

First of all, that case was conduct so minor, it wouldn't even count for criminal history, even if it were a conviction, which it's not. And the two missed court dates, both times, Mr. Malanga reached out to the court proactively

and appeared for the date. The first one was his initial. But he then scheduled another initial hearing. He appeared for four court dates thereafter and entered into a plea of abeyance.

He missed one court date while on supervision, but the issue was for failing to make financial payments towards a fine of, I believe it was $590. Ultimately, he paid the fine. He successfully completed, and the case was dismissed.

That is absolutely incompatible with what we have here, where he is in the spotlight in a way he -- few of us ever are in our lifetimes. He will have the supervision of federal pretrial services, me, third-party custodians, his surrounding family, and his community. And with GPS, as we're proposing, we'll know exactly where he is at all times.

In terms of his employment, as I mentioned, I spoke to two of his employers. They gave glowing reviews. And he has a lead on a potential job sitting here in this courtroom today. Now, if that job doesn't work out -- it's not guaranteed -- but if it doesn't, I think the skills and the work ethic he has demonstrated put him in excellent stead to find future employment.

And then lastly, I have to address character, which is one of the considerations. I hope the Court can

feel the love for Marcel in this room. That is because of the kind and generous person he is. We see this in his commitment to sports and personal excellence. He was team captain of the football team his senior year. He was a model for his teammates. He was a beloved volunteer coach. And we also see that in the protective and adult role he had to play in his family. And I need to describe a little bit about that role, because it bears directly on release.

Marcel is the oldest of his siblings, full and half. His father was largely absent for a lot of his growing years. And his mother had her own struggles with bad relationships and pretty significant domestic violence, which is what led to Mr. Marcel living for a number of years with the Malanga side of the family, and contributed to some of the tension that the government has alluded to.

That meant that Mr. Marcel, who, again, has been a child until very recently, had to fill holes left by both of his parents. He was the one who protected his mom from her boyfriends. He was the one who protected his younger siblings. When his younger brother was struggling and his father wasn't here, it was Marcel who stepped up to take the mentorship role. When his sister was diagnosed with a serious illness in the fall of 2023, it was Marcel who was in the hospital with her.

This is who Marcel Malanga is. This is the kind

of character that will make him successful on pretrial release. And this factor weighs heavily and unquestionably in favor of release.

Lastly, I want to address the nature and seriousness of danger, which of the two considerations, flight and danger, I think is the more salient of the two. The government's argument, essentially, is that these charges are so extreme and dangerous that, by their very nature, they make Mr. Malanga unreleasable.

But in assessing this prong, there are two things the Court has to keep in mind. One, the BRA requires reasonable assurances, not ironclad ones.

And two, the Court must assess that danger realistically. That means, assessing the risk of danger as it is now, not at the time of these allegations, taking into account the release plan we're proposing. And, truly, that risk is nonexistent. There is nothing even remotely like this in Marcel's personal history without his father's influence. That influence is gone. Our proposed plan will significantly restrict his activities and whereabouts and ensure he is monitored closely. He has already suffered enormous lifelong losses because of this case, and he has no motivation to make it worse.

And as a practical matter, there is no way that he could engage in anything even remotely like this behavior

without being detected, because things have seismically changed in his life. The Court is now watching. Pretrial is watching. His family is watching. His local community, national community, and even international community is watching. And he knows he would be found out immediately if he put one toe out of line, which would lead to immediate revocation of release, not to mention other adverse consequences for himself and his family. So given this, the risk of future danger, which we submit is almost zero, absolutely is manageable with our proposed plan.

So Your Honor, I will conclude with this. Nothing that I have said is intended to in any way diminish the seriousness of the allegations here. But pretrial detention is not a means to express outrage, nor is it a way to preemptively punish somebody before there's been a finding of guilt. And in cases like these, that's why it's critical to heed the instruction from the Supreme Court that liberty is the norm and preventative detention is the carefully limited exception. It is reserved for a very narrow category of people for whom, truly, no set of conditions can reasonably assure safety and appearance.

Mr. Malanga does not fall into that category, and we urge the Court to release him.

THE COURT: One question for you. You may have heard for the first time today the alleged statement that he

should have been left in the DRC. Is that the first time you heard that statement?

MS. STIRBA: It was.

THE COURT: So you don't have any ability to respond to that, not truly?

MS. STIRBA: I don't.

THE COURT: Do you infer anything from it?

MS. STIRBA: I don't. And I honestly don't think we can. This is somebody who had just gone through a horrific experience and was being herded onto a plane and was scared. And I have no idea what that means. I don't know the context. So I think I would ask the Court not to put, really, any stock in this, because I don't think the Court can.

THE COURT: Okay. Thank you.

Ms. Lazaro or Mr. Jordan for Mr. Thompson?

MS. LAZARO: Thank you, Your Honor.

Tyler just turned 22 in March of this year, which meant he was 21 years old last year at this time. And the Supreme Court has recognized in the *Atkins* case that the male brain is not fully developed until the age of 26. Indeed, in *Atkins*, the Supreme Court noted that the government may not treat a 22 year old like a 28 year old. And this Court should follow that holding in *Atkins* in evaluating Mr. Thompson's state of mind and how vulnerable

he would be to another's pressure, especially when the objective facts told Tyler that the actions being undertaken were lawful to essentially put in a new form of government.

And I take that from -- I echo what Ms. Stirba said regarding the discovery and not being able to review it all. So in highlighting some of these things, you know, it may come to light that there's additional information out there.

But what we saw today, especially in that video where they're driving around the residences, was that Christian Malanga was in a police vehicle. There was at least a police or a military-type person who stopped and got in the car with them. And there was no talk of murdering anyone or doing anything violent. They were talking about making arrests. And I say that -- and I'll get into some of the other facts a little bit later -- but I start with that, you know, because when we're looking at Tyler Thompson and what some of the other evidence has shown, objectively, you know, is there -- even in the DRC, you know, this is seemingly a government-sanctioned event that he's participating in.

THE COURT: I'm sorry, I may not understand your argument. During the drive as they were surveilling the prime minister's house, you were saying there was someone with the DRC government in the car?

MS. LAZARO: Well, they're in a police vehicle. We see the police vehicle, or a person dressed as a policeman --

THE COURT: In the car with them?

MS. LAZARO: -- stop, and I think what the government said is he got in the car with them.

THE COURT: Maybe I misunderstood. But there were definitely people at the Palais that, of course, were dressed as -- military uniforms.

MS. LAZARO: Right. I'm talking before that. They're in a, what looks like a police vehicle. And I'm just saying that, seeing that for the first, you know, for the first time.

THE COURT: I'll make sure to ask the government. But your belief is that may have been -- this was sort of a, did you say government sanctioned?

MS. LAZARO: Well, I mean, not -- I mean, looking at things just in that video, you know, and they're talking about things. They're talking about making arrests, and they're talking about the military making arrests. There's no talk during that video, you know, of Tyler partaking in anything with a drone or doing -- anybody doing anything violent during that portion of the, at least what we were shown today.

THE COURT: Okay.

MS. LAZARO: And I'm going to -- I'll come back to that.

I want to talk a little bit about the DRC, and address the statute itself first and then rebuttable presumption of detention in the case law that flows from the statute. I'm later going to talk about a few cases that are more recent cases, more along the lines of the nature of the allegations presented in this case where individuals were allowed to be released pretrial.

On a side note, I would expect in this case as part of the discovery, that we'll probably -- or we should be getting things that involve the Department of State and some different things, perhaps from the NSA, Department of Defense, and even the CIA. And I say that given my involvement over the past year while they were detained in the DRC and the efforts that were made to get them back.

I would also note Mr. Thompson's family has been cooperative with the FBI from day one. I know the government points to it being a problem for him to perhaps go to his mother's house because, you know, he was living there at the time. But when she found out that he was detained in the DRC, she, herself, called the FBI to, you know, ask for help, ask what's happening, what's going on.

And then throughout this process for the last year, she's maintained communication with them. They have

conducted searches, you know, and she willingly allowed them in her home, gave them a number of devices that belonged to Tyler. We don't believe anything on those devices has anything to do with this case.

But what I think -- what will come out some of that stuff is that Tyler also had an interest in drones in terms of starting a new business, or he was saving up money to purchase his own drone, because what he wanted to start doing was, like, lidar topographically video-type things for real estate and some other things. And I'm going to touch back on that as well.

Mr. Thompson is neither a danger to the community or a flight risk. And I believe there are conditions that can be set that reasonably assure that he'll return to court and ensure that the community is not at risk by his release.

The case law emphasizes two checks that the Bail Reform Act and the Constitution impose on the presumption of detention. Case law has established those checks as an easy-to-meet standard for rebutting the presumption, and the prosecution always bears the burden of persuasion; and two, the presumption, alone, does not warrant detention and must always be weighed, along with the other factors. In addition, it is impermissible to detain a defendant in a presumption case, based solely on the nature of the crime charged or the weight of the evidence. I do believe even

the case law cited by the government does require that the Court take into consideration the other factors.

I state this because I think, otherwise, internationals or a case that involves some sort of national security or charges, such as those, there never could be bail, and I don't think the statute contemplates that.

Under the law, very little is required for a defendant to rebut the presumption of detention, and therefore judges should find the presumption rebutted in most cases. To rebut the presumption, the defendant simply needs to produce some evidence that he will not flee or endanger the community, if released.

The *Dominguez* court goes on to say that there's a -- that the burden of persuasion always rests with the government. And indeed, the presumption of detention is rebutted by any evidence favorable to a defendant that comes within the category listed in 3142(g), including evidence of their marital, family, employment status, ties to and role in the community, and other evidence encompassed within 3142(g)(3).

Additionally, any evidence of economic and social stability can rebut the presumption. Notably, a defendant's ties to the community standing alone definitely rebut this presumption, where the defendant has presented considerable evidence of his longstanding ties to the locality.

Importantly, as I've mentioned, the government always bears the burden of persuasion at all times, and it does not shift to the defense. In the *Dominguez* case, for example, the Seventh Circuit determined that the defendants had sufficiently rebutted the presumption of detention by introducing fairly minimal evidence about their employment and family ties. Both the defendants were human immigrants in that case and were not United States citizens but had been in the country lawfully for five years, and neither had a criminal record. One of the defendants was married and had family members in the United States, and both were employed. These facts, alone, were sufficient for the Seventh Circuit to find the defendants had rebutted the presumption.

Step two, the presumption alone is not sufficient to warrant detention and must be weighed along with the other 3142(g) factors. After the presumption is rebutted, the Court must weigh the presumption against all other evidence about the defendant's history and characteristics that tilt the scale in favor of release.

The Court should not give presumption undue weight if evidence relating to other 3142(g) factors supports release. Additionally, the judge may not detain -- or a court may not detain a defendant in a presumption case based solely on an unrebutted presumption alone, evidence of the

defendant's past dangerousness, the nature and seriousness of the crime charged, and the weight of the evidence of the person's guilt.

First, the defendant never bears the weight of persuasion, even if the presumption is rebutted. It is not incumbent on the defendant to persuade the judge that there exist conditions of release that will reasonably assure the safety of the community. That burden lies with the government, the standard of which is always clear and convincing evidence.

Second, if the presumption is not rebutted, the judge is prohibited from detaining a defendant based on the evidence that he has been a danger in the past. Instead, past dangerous conduct is relevant only to the extent the government can prove by clear and convincing evidence that the defendant is likely to engage in criminal conduct undeterred by release conditions. That also comes from the *Dominguez* case.

Even when a defendant is charged with a serious crime, there are often release conditions that will reasonably assure the safety of the community. And I raise that based on the defendant's argument and their citing of the *Cisneros* case in their detention brief. I think *Cisneros* is distinguishable from the facts in this case because it dealt with the murder of a prospective witness,

which could, you know, then be inferred as, not only a serious crime, but also, perhaps, a defendant's ability or wanting to recidivate a similar crime.

In this case, although the allegations are quite serious, I don't think there is any possibility of any similar behavior happening with Mr. Thompson again. And there's no risk to this community.

Third, to rebut the presumption of dangerousness, a defendant need not demonstrate a serious crime is not dangerous to the community; instead, the Court should analyze the defendant's individual characteristics.

And fourth, the Court is forbidden from relying solely on the weight of the evidence of guilt to detain a defendant in a presumption case. The defendant is not required to rebut the government's showing of probable cause to believe that he is guilty of the crimes charged. This makes sense. A person's likelihood of guilt is analytically distinct from whether their conditions of release will reasonably assure a person's appearance in court or the safety to the community.

In this case, I believe the presumption of detention has been rebutted. As detailed below, there is much more than just some evidence that Mr. Thompson will not flee or endanger the community if released.

Mr. Thompson has lengthy and strong ties to this

community specifically, which I believe was conceded by the government. He lacks any prior criminal history. And our proposed bond and conditions of release rebut the presumption in this case and will reasonably assure that he will appear in court.

Like we stated and I believe was in the summary from pretrial, he was born in Salt Lake City. And I'm not sure they got quite that detailed into it, but he was born here in the Salt Lake City community at St. Mark's Hospital. His parents are divorced. They both live in West Jordan. They live 20 minutes from each other. And both have maintained a good relationship with each other and with Tyler as well.

He went to school and graduated from Copper Hills High School. He was on the honor role, at least on several semesters, so he did well as a student. He played football there. And he was at the time -- or after he graduated, he was living with his mother.

He had been employed at a number of different things. He was driving for Uber Eats or a delivery service at the time -- and I don't recall the exact one. He was working a construction job. That employer at his construction job, which is now Wild Steed Construction, actually reached out to his mom when he found out that Tyler had been detained through the news articles in the DRC and

expressed his support for Tyler. So I think, you know, taking him back as an employee wouldn't be out of the question.

Additionally, his father and stepmother have been married for, I think 13 years, run a very large and successful party planning business. And so even when he was employed at these other venues or other jobs, he would work weekends with them, helping them set up parties. He would work in the warehouse. And so he could also go back to full-time employment there.

Mr. Thompson's family is willing to sign a bond or act as a third-party custodian, whether he were to stay at his mother's house or his father's.

His mother is also remarried.

Mr. Thompson's father is Tyler Thompson, Sr. He was also born and raised in Utah. He works for CHG Healthcare. Has been there over seven years. He has -- and then they also have the Snap Pop Party, which is what was proposed as possible employment. He, as I mentioned, has been married for 13 years. They have -- they co-own the party business. And I believe he has a half brother, but I could be mistaken there.

His mother is also remarried. She works for Macy's as a crime investigator, essentially. So she actually works with the FBI quite frequently as part of her

job. I think she helps do undercover stings and things along that nature, and I believe which is why probably one of her first calls was to the FBI when she found out that Tyler had been detained.

She is also remarried. Her husband works from home for Select Health. He has a ten-year history of employment with them. And his -- what's interesting, I think, about that is he -- our proposal would be that Tyler either be released to his mother or his father. I don't know that there's necessarily a preference. Either one, given that there's, I think, somebody who works from home always present in the home at either residence. His stepfather's office is actually in the basement, which is down near Tyler's bedroom.

Regardless of whether this Court finds the presumption of detention is rebutted, I believe there's also conditions that could be put in place to assure that he would be released, whether that be -- I mean, at the very least, he's going to be on some sort of pretrial supervision with probation. We would propose an ankle monitor, GPS monitor. The government has his passport. And prior to this trip, I don't believe he had ever traveled much anyway. This isn't a kid who has a history of jet setting in any way. In fact, I think he's probably more of a homebody than anything. He has a very close relationship with his mother.

In this case, the government's not carried its high burden of proving by clear and convincing evidence that there are no release conditions as it relates to Mr. Thompson that could reasonably ensure the safety in this case or that he'll appear in court.

I want to go through just a few things as it relates to this case, and then just highlight a couple of cases where there have been fairly serious allegations where the Court has granted release.

When we -- I have not reviewed any of the discovery. There was an index that was turned over, and that's about as far as I've gotten through it. But it appears that there were pole cameras at some point during this investigation, which, at the very least, suggest they were monitoring, or at least investigating on some level prior to Mr. Thompson ever leaving the state of Utah. And if they were aware of this and were investigating, they let him get on a plane. You know, if they were concerned that this was going to happen, you know, they did allow him to leave the state of Utah and didn't stop him.

And I guess as it relates to this, if he was such a flight risk, you know, to argue he's a flight risk now I think cuts both ways that they didn't stop it. And if he was such a danger, why would they let him go in the first place?

The other thing I want to highlight is the 1911 firearm. He declared that properly. I know the government noted that there was customs paperwork that was filled out as it relates to that gun. He wasn't trying to disassemble or sneak it into the country. He also -- I believe the government has possession of that firearm. Like I said, we haven't been through the entirety of the discovery. But that firearm was, at some point during his travel, confiscated through customs. I'm working on getting that information. But there should be a customs form where Tyler actually went to customs in Johannesburg and reported that the gun had been taken out of his luggage or wasn't there.

And I don't know, there was three sets of travel, there wasn't two. They actually -- what the government didn't show you is they traveled around Africa while they were there. They left and went to Swaziland. They did a number of tourist-type things that we believe will probably be on those phones, considering everything else that is, to show what he was doing. His mom, also, I think turned over some photographs and calls that he had sent to her while he was down there when the FBI asked her for any information.

And I think the fact that he declared the gun and also, you know, when he realized it was no longer in his luggage and filled out the proper forms and worked through customs, I think also speaks to perhaps his mindset of what

he thought was going to be happening in the DRC. And, you know, perhaps this wasn't something as violent as the government is arguing it was today.

Additionally, they don't present any evidence that -- when they show the videos at Mr. Moesser's home, where they're talking about any of these weapons that would attach to a drone, there's no evidence that Tyler was there, was part of those discussions, or had any knowledge that those weapons even existed based on what was shown today.

He wasn't there during the conversations. They don't have any communication as it relates to Tyler talking about weapons being dropped from drones, anything along those lines.

Tyler's always maintained, even throughout the trial in the DRC, that he was going there to map, do topographical maps for Mr. Malanga as it relates to some purchases of gold mines.

THE COURT: He did have the flamethrower attachment, right?

MS. LAZARO: He did, or at least it appears that that was...

THE COURT: How does that relate to lidar topographical mapping?

MS. LAZARO: I mean, I think it could bear -- I think there -- when I Googled flamethrowers as they relate

to drones, nothing as far as weapons come up on it. A lot of -- many of the uses as it relates to flamethrowers were to eradicate wasps nests, to do control-type burns in forest-type environments or brush or things along those nature. So I think, you know, there could be a million reasons for that, that have nothing to do with anything related to a violent overthrow or some sort of coup. I mean, it very well could be that the reason he had the flamethrower is if he was going to be trying to map out some gold mines, if there was brush or debris, the flamethrower very easily could have been used for those purposes, because the first thing you Google, those are the reasons that come up for having those for a drone.

There really was no evidence that he was present during that attack that was presented by the government today.

I would note -- I know the government brought up some of the things that happened in the trial during the DRC. To my knowledge, there isn't or I haven't been able to come up with some sort of certified or actual transcript of that. But I do know that when they talk about those guards who got killed at, I think, Kamerhe's residence, that they showed video -- or photographs of, one of the security guards from Kamerhe's home that was not with the coup -- or not with the alleged rebel forces but worked for Kamerhe,

testified at the trial in the DRC that he didn't see, I don't think Tyler, Ben, or Marcel with a weapon. In fact, while the shooting was happening, the three of them were crouched down and hiding behind the vehicle and not participating in any way.

THE COURT: They were at the location but not with weapons; that's the proffer?

MS. LAZARO: Right.

THE COURT: Okay.

MS. LAZARO: Additionally, I don't recall any evidence shown today that any of the devices that were discussed that might attach to a drone were ever shipped to the DRC or ever arrived in Africa or anything along those lines. I think we saw pictures of some maybe in somebody's trunk. But I don't think the government's presented any evidence, as it relates to any of the drone attachments, that those ever made it or were ever sent to or taken to the DRC.

Additionally, there's no evidence that the drone was in any way used during what happened on the night of the incident that we reviewed video of, or that Tyler was involved in firing a weapon or shooting at anyone.

THE COURT: How was he arrested by DRC officials?

MS. LAZARO: It's my understanding that he was found not far from the White House.

THE COURT: So not at the hotel, nothing like that? He was near the White House?

MS. LAZARO: That's correct. That's my understanding.

THE COURT: Okay. Go ahead.

MS. LAZARO: And I think, as Ms. Stirba laid out, the circumstances they endured shortly thereafter are things I wish I could unhear, let alone have to live through. And I know it's not something the Court takes into consideration, likely, at this juncture. But I think given the type of case this is and what we're talking about, I'm not sure we can hide from all the things that happened there as well.

And I also think that when we talk about whether or not he's ever going to flee, you know, he went through a trial down there and was sentenced to death. Went through an appeal down there, it was confirmed. Ultimately, you know, I believe through actions of the State Department and other United States officials, those sentences were commuted and he was brought back.

Everyone, and I --

THE COURT: I think they were commuted and then pardoned, right?

MS. LAZARO: Yeah, I'm not entirely sure.

THE COURT: I think that only goes to the issue of

whether there is an outstanding issue remaining in DRC. I don't think there is. I think it was commuted and then pardoned, and then they left DRC without issue.

MS. LAZARO: Yeah. And I think they were told at the time that it was a humanitarian release and that they would be going home. They weren't told until they were getting on a plane, I believe, that they were actually coming back to face charges here in the United States.

THE COURT: What else do you want me to know?

MS. LAZARO: I'll wrap up with that. I think the Court's well aware of the factors and the case law.

But as it relates to this case, I think there's certainly conditions that could be imposed for Mr. Thompson to both address the government's concerns of any danger or flight risk -- and the Court's.

THE COURT: Thank you.

Mr. Merrill?

MR. MERRILL: Good afternoon, Your Honor. I'm mindful of the time. I'm also mindful that the other defendants' counsel have made a number of legal points. I will do my best not to repeat those, and we'll try to just focus on the things specific to Mr. Moesser.

I think there's no question that he is in a much different situation than the other defendants. He's 67 years old. He's retired after a lifetime of employment.

He's a lifelong Utah resident. He's been married for 45 years. He has owned a home in West Valley for more than 20 years. He has three siblings that he interacts with on a regular basis, had two children, and has three grandchildren. Everyone lives in Utah, and he has been here his whole life.

He's not from the Congo. He's not related to anyone from the Congo. He's never been to the Congo. And there's no indication that he knows about or even cares about Congolese politics.

What we do know about his ties to the Congo is that he met Christian Malanga, not recently, as I think was suggested earlier, but that he met him as early as 2014. Sitting in this court hearing, I pulled up a Facebook post from 2014 that showed Mr. Moesser with these security guards. And it was from May -- I'm sorry, I said 2014, I misspoke. May 2016. So eight years before this attack. And the Facebook post says, "Friends from the Congo went through some firearms training." He taught them how to shoot. And I have not heard anything or seen anything from the government that suggests that this conspiracy began eight years ago.

So I -- and as far as we know, Mr. Moesser hasn't seen Mr. Malanga -- Mr. Christian Malanga -- hadn't seen him in at least four years before all of this came up. He got

some messages and said, Hey, can my son and some of his associates meet with you? And that's where the story picks up. So I think it's quite a stretch to suggest that what was happening eight years ago had anything to do with this supposed conspiracy.

Based on those factors, I think there are conditions of release that would assure his appearance and would provide for safety of the community. Those could include location monitoring, no firearms. We believe they seized every firearm that he has -- but obviously, if there's a condition, we are willing to go verify that -- based on the limited discovery that's been provided to us, which was just yesterday in preparation for this hearing, which is a small fraction of the actual discovery. There were hundreds of photos of Mr. Moesser's house, every nook and cranny. I would be very surprised if the FBI didn't find every weapon there. He could surrender his passport and obviously participate in regular reporting, as the Court deems appropriate.

Under these circumstances, we think that the presumption has been rebutted. In fact, the government, Mr. Stowers mentioned these positive factors that included his time in Utah and his marriage. I think just based on that admission alone, you can say we're beyond the presumption and we're just focusing on the factors with

respect to his situation.

Let me just mention a couple of procedural things that I think we're a little bit concerned about. Because of the discovery -- and I won't repeat the details -- but basically it's a hard drive in New Jersey that's being processed. We have not had the chance to review any of the items on there.

I don't know if these items are on there, but today I heard three witness statements mentioned. One was a Mr. Gonzalez, one was a Mr. Wright, and one was a confidential informant who supposedly said Mr. Moesser said something about being a sniper, too. We've never seen those statements.

And pursuant to -- based on Rule 26.2(a), we would make a motion to at least have the opportunity to examine those and bring those to the Court's attention if there's something that we think materially that's been left out, if the Court has any intention of relying on those for a decision to detain Mr. Moesser. We just have not seen them.

In addition, I don't want to spend a lot of time about these books, but I don't even know -- I doubt the books are even, at least in their entirety, in the discovery. And to detain someone or to draw any conclusions about someone's personality or thoughts or views or likelihood of appearing or danger to the community based on

books on their bookshelf, I think is really stretching it. And I'll leave it there.

So if the Court has any intention of relying on those books or the titles or anything that may or may not be in those books as part of a decision of detaining Mr. Moesser, we'd at least like the opportunity to see those books, get a complete list, and examine them as well.

In addition, you heard some clips from an interview that Mr. Moesser gave. It was two hours and ten minutes. That is the one piece of discovery we have had for several weeks. We used Word to create a transcript from that. We've been through it. And I can tell you, it doesn't sound like the same thing that the government kept referring to. And we certainly don't draw the same conclusions from that. If the Court intends to rely on those clips, we'd be happy to at least provide the Court with a complete transcript so that it can see the context.

What it seems like is that Mr. Moesser was reluctant to speak. He'd been awakened early in the morning as part of the execution of a search warrant. He was surprised and may have minimized or not been entirely forthcoming. But read in its entirety, it does not read as a guy who is trying to deceive and lie to the government.

And I don't know that -- if you've seen the pictures, I don't think we really saw them today, but there

are pictures of his residence, hundreds, well over a thousand pictures of his residence. There are nooks and crannies in the house, there's a machine shop, there's garages, there's things in the yard. There's stuff everywhere. I don't know how you could say whether any of that is concealed. It's there. They found it. They found it over a year after the events here. He obviously didn't say to himself, even after he became aware of the failed coup, that, Oh, I have things that related to what these guys were attempting to do, and I should get rid of them. And if he did, putting them in the cabinet underneath the cereal in the yard obviously was not a very effective way of trying to hide it. So I think that it's quite a stretch to suggest that he was being dishonest and disingenuous there.

Let me just mention a few other factors here that I think would support a finding by this Court that there are conditions that could assure his appearance and the safety of the community. I'm kind of flipping the order here.

But for Factors 3 and 4, we've talked about his kind of personal background. It's -- there's no question that he's a gun enthusiast. He had hundreds of guns. I think if we looked at them, counted them up, they may be in excess of 500 guns. I don't know.

He's collected them throughout his life. He's inherited them. He shoots them. He goes out and does

target practice. He's also an avid hunter, particularly a big game hunter. He's been all over the world big game hunting. That's why he travels.

And there's never been any hint or suggestion that he's been involved in any sort of military or paramilitary or revolutionary-type activities. He goes and has been to Africa a number of times to go hunting. Most recently, he was crocodile hunting in South Africa. So that's what he does.

He also had a business for a time where he would teach people how to shoot. That's how Mr. Christian Malanga and his security guards were referred to him eight years before all of this happened.

In terms of his past conduct and criminal history, he does have a criminal history. There are, it looks like about nine priors. Five of those are DUIs, the last one is in 2013. He has told us at least for the last year that he no longer drinks. He has given that up at his age and no longer does so.

And then I don't think you can draw any conclusions about his -- well, I think you can draw conclusions from his criminal history about whether he's going to appear. He always appeared. He's had all of these cases, some of which were -- many -- a number of which were felonies, initially, although most of those were dropped to

misdemeanors as part of a resolution. But he always appeared. There's no indication in any of these cases that he ever failed to appear.

In addition, none of these cases involved violence or the misuse of a firearm or explosive. The closest you get is the 2014 plea to a misdemeanor. It says, "discharge of a projectile weapon." I'm told -- we have not been able to independently verify this -- but I'm told, and we believe the evidence would show, that that was a BB gun he was shooting in his backyard, and a neighbor complained. And police came and said, You can't shoot a BB gun in your own yard. And that is what led to those charges.

So nothing in any of these priors suggests that he would be a danger to the community. He's lived there for 67 years. And you can see, you know, some of his not-so-great moments, but they are not, particularly since he stopped drinking, anything we believe that would make it impossible or make it unsafe for the community or that he wouldn't appear.

In terms of going back to Factors 1 and 2, let me just talk about a couple of things briefly there.

So we talked about how he didn't go to the Congo. There's no evidence he purchased a ticket. We didn't see a ticket today. We saw an email where Tyler's questioning whether some ticket, which we have never seen, was

purchased, and whether it could be changed in some way. But we haven't seen the ticket. And as far as we know, he never purchased one and made clear, when pressed, that he wasn't going, that he was going on vacation with his wife. And we believe he was on vacation with his wife. We need to match up the exact days. But he went on a trip with his wife to Dominican Republic, and perhaps even was in Miami on his way back when he heard about the coup. But we would need to verify that, for sure. He certainly wasn't planning to go to the Congo.

There's this talk of Congo specials. It's a special type of weapon. He was asked to provide five. He mentioned in a separate place six or eight.

Let me tell you what he did do. He was willing to sell things when asked. And if they wanted to -- weapons specially equipped -- and basically it was a very standard weapon that was just going to be changed so it could take AK-47 ammunition -- there's no evidence that he ever prepared or sold those Congo specials or that they ever went to Africa.

There was talk of a sniper rifle. Well, the only rifle that we saw evidence of today was broken. It was never shipped, never went to Africa, and it was still in Mr. Moesser's bedroom a year after the supposed coup. He made no efforts to hide it or move it. There's evidence

that he tinkered with, quote, loud items, and also, quote, explosive devices. But we saw a prototype of one of the metal explosive devices. We saw a lot of parts for the loud items. There's no evidence any of those were completed. The closest we got is, he had a -- he tested one with a primer that he dropped 15 feet off of his back deck and saw that it, in fact, made an explosion. But there's no evidence that any of them were completed. None that were shipped -- no evidence they were shipped. And no evidence that they were used as part of this attack.

And there's no evidence that he was ever paid a dime. And we would proffer that he was never paid a dime. He was eager to -- he was eager to sell them weapons. I shouldn't say "eager." He was willing to sell them weapons. He was willing to sell them his machines. He was willing to sell them his whole machine shop. You saw the evidence of that.

And this is somewhat outdated equipment. There's pretty good evidence that, as a retired guy, he was happy to make some money in a number of different ways. But he never was paid for any of those things, and in all likelihood because they were never completed.

So in our view, those are the main things that occurred to us. We think that we have rebutted the presumption that he wouldn't appear or that he would be a

danger. And we also believe that there's plenty of evidence that there could be conditions that would reasonably assure his appearance and the safety of others and of the community.

And for that reason, we ask that he be released on reasonable conditions, and that if for some reason the Court is hesitating on that, that we at least be permitted to see the discovery, see the statements, see the other material that the government referred to today, and bring inconsistent items to the Court's attention, as needed.

THE COURT: Thank you. Just once question: Should I be concerned about his nondisclosure of the room in which many of the firearms were found?

MR. MERRILL: You know, we have not understood that to be nondisclosed.

THE COURT: Does he make a statement regarding it in his post-Miranda statement to the FBI?

MR. MERRILL: I don't believe so. But Mr. Metos...

(Mr. Merrill and Mr. Metos conferred.)

MR. MERRILL: All right. Your Honor, our best recollection, and you have -- these are two recollections is that he was never asked about it, but that it's pretty obvious when you go through his house that there's this compartment in the floor that goes to another place.

I don't know what the government's thinking was. It's possible that they had a search warrant for his house, and that they saw that this went -- this compartment in the floor. I think they figured out very quickly that there was this other area and that, perhaps, they were concerned that the initial search warrant wouldn't cover it. So they came back and got another search warrant. And all the weapons were still there. There's no evidence that he tried to move them or -- or anything tried to happen, and that's where they found a lot of these weapons.

THE COURT: So as far as you know, he made no disclosures about those in that interview --

MR. MERRILL: That's right.

THE COURT: -- preceding that?

MR. MERRILL: We don't think he concealed it, and we don't even think he was asked about it, and they were able to find it.

THE COURT: Got it.

MR. MERRILL: The last thing I will mention -- Mr. Metos reminded me -- is that in most of his prior criminal cases, he was placed on probation. And he -- some as long as two years. And in all of the instances, he successfully complied with whatever terms of probation he was given and completed the probation without any issues that we're aware of.

THE COURT: Apologize for keeping you.

One question. The government makes a lot of hay out of the 2009 conviction pled down to a misdemeanor regarding black powder transferred over to Africa. The reason that it's relevant, the government argues, is that he would have been able to give meaningful instruction, would have known about what Mr. Malanga and others were planning to do and gave them instruction that they would have to source it after they got to Africa.

How do you read all of that?

MR. MERRILL: Well, what I read is that he thought he could take hunting weapons and some form of hunting ammunition. And he has been a hunter with very old weapons where you create your own ammunition and believed that he could take it on a plane. A friend of his that he'd had a falling out with apparently wanted to get him in trouble and tipped the FBI off. And so they came and found it. Initially, they looked at what was in his luggage and said, Yeah, you're right. It's probably fine. And it was later they came back and took a closer look, or maybe the people that were actually loading it in the plane took a closer look and said, This doesn't look right.

I don't think it was black powder. I think it was cartridges that had been reloaded. And so I think, generally, you can take weapons and ammunition,

factory-prepared ammunition, but not your own ammunition. And I think that's what happened. I think that's why it was taken all the way down to a misdemeanor, ultimately. We don't think it's very relevant.

And I think he learns that, Hey, I've got to be very careful about what I can take on a plane. I think it's clear he knew that. But I don't know that they needed -- they could have Googled that. I don't know that they needed Mr. Moesser to find out, Hey, what type of explosive devices can we take on planes? And again, the evidence is, is they didn't take any, or even try to ship any, or that he even completed any.

So we think the notion that he's an explosive mastermind as part of this alleged conspiracy is a huge stretch, given his involvement.

THE COURT: Thank you, Mr. Merrill.

Okay. Government counsel, let's walk through them one by one. Mr. Malanga first.

MR. WHITTAKER: Your Honor, if I can just stay back here? Because I have a couple of other things I want to just point the Court to.

THE COURT: Sure.

MR. WHITTAKER: First, as an overriding factor, I just want to point the Court to several cases that we cited in our brief, or in our motion or detention. That's the

Ninth Circuit case, *United States v. Hir*, 2008, where the *Hir* Court explained that they concluded that the defendant's history as a law-abiding citizen and his significant ties to the local community did not "outweigh the extremely serious nature of the offenses with which he is charged, including his willingness to provide dangerous materials for use against civilians, while attempting to disguise his role in the affair, the weight of the evidence against him, and the nature and gravity of the danger that would be posed by his release."

And we would suggest that that's the same here. We would not concede that the history and the characteristics of each defendant outweigh and show that they should be released on conditions.

But even if those factors weighed in favor of the defendants, we would argue, as the Ninth Circuit held, that the nature and seriousness of these offenses far outweigh the positive history and characteristics of the defendants, such as, like, ties to the community, family support, those kind of things.

We also cited the *United States v. Al-Arian* case from the Middle District of Florida, 2003, which was similar. It described the defendants as "'prominent leaders and model citizens of civic involvement in their respective communities,' but that these positive characteristics were

outweighed by the charges of showing various violent crimes and providing material support to a designated terrorist organization and thus holding that they 'pose[d] a danger to the community.'"

And then thirdly, the *Goba* case from Western District of New York, holding, similarly, that the seriousness of these offenses and the weight of the evidence, even though they had been model citizens up to that point, far outweighs the positive history and characteristics. We would point the Court to those factors.

And then, also, I want to highlight for the Court in our brief on page 14, we cite the Tenth Circuit case, the *Cisneros* case, that -- it was raised today that we can't -- the government can't show that based upon the past conduct of dangerousness and violence and that kind of thing that the defendants would actually engage in that kind of conduct again. The *Cisneros* court said the Government doesn't need to show that. It says, "Although the government obviously cannot prove that Cisneros would in fact injure another individual or the community if she were released pending trial, it has presented clear and convincing evidence that she is an identified and articulable threat based upon the prior conduct of the Cisneros Organization," which included things like murder and conspiracy to murder, which I would argue is very similar here.

I don't want to lose sight of the fact here that six people died in this conspiracy. And one of those people was an innocent civilian who was in his car with his girlfriend and another friend in the back seat. And Christian Malanga shot him at point blank range.

And then for -- I heard several overarching arguments, which I'm kind of doing an overall thing first, is that these defendants, we don't have evidence that they actually pulled the trigger, that they actually shot anybody. That's true. We don't. But they were part of a conspiracy. And they joined in this conspiracy, training with firearms for "war," "more war," "war ready." They had -- they went to multiple firing ranges to get comfortable with assault rifles. You see them in the attack with assault rifles.

Tyler Thompson is carrying around over his shoulder an assault rifle. Somebody who is carrying around an assault rifle has one purpose in an attack, and that's to kill other people. You don't carry around an assault rifle like that if you don't have an intent to use it and kill people. Marcel Malanga, same thing: We need to get these Uzis working. We need to get these guns working, because we need them to carry out the attack. They built bombs, bombs with shrapnel to kill people.

So for the defense to argue like these guys had no

intent to hurt or kill anybody, they did. They conspired together. That's what this case is, it's a conspiracy. When you join that conspiracy, you know the ends and the goals of that conspiracy. You're responsible for all the conduct of the conspiracy. They're responsible just as much as Christian was to shoot that innocent bystander, to shoot and kill the other people that were harmed in the attack.

I want to take the Court really quickly to, it was referenced in, I believe, Ms. Lazaro's presentation -- if the Court will bear with me one second -- about the attack that happened at Kamerhe's residence. And there was a commander that testified in the trial there. And if we can bring it up, I have his -- the relevant part of his testimony. It was translated by an FBI linguist from French into English. And this was the translated version from the FBI linguist.

He describes what happened at Kamerhe's residence. He says (as read):

"It was around four o'clock in the morning, I was getting ready to wash myself. I went out, I saw three drones." And we know that these defendants acquired drones and were going to use drones in the attack. We have a witness that said he saw them using the drones.

"-- wondered about the reason for their presence. One of our people told me that when the president is there,

the drone hovers. So I kept on getting ready. I have seven Jeeps and one bus. I pointed my finger and they came to where I was. I raised my hand, and two of them came out with one asking, 'Where is Vital Kamerhe?' You do not know that your power is at an end. Before I could put my hands in the air, they had started shooting.

"When he asked me where Vital was, I told him that I had just arrived. And one of them took my phones and my J.P.

"They handcuffed me. The last one alluded to is seated here in this room. They killed two of my police officers. One of them had fallen in our backyard. I heard someone say, 'Abubakar is dead.' That is when I learned the name of Christian Malanga. I had seen three white people in the group near the Belgian Embassy."

Now, Your Honor, we know that there was only three white people involved in this coup attack, Ben Polun and Tyler Thompson. I guess I misspoke. There was -- we know of at least two.

"Where were those three white people?

"By the Belgian Embassy.

"When the shots went off at the residence of Vital Kamerhe, what was their fire power?

"I had seen them as they were coming out, but I am unable to say who was armed and who was not. There were

seven Jeeps and one Spirit of Life Bus that they had abandoned.

"In what way did they handcuff others?

"They had them handcuffed in the back using police plastic cuffs.

"Who handcuffed you?

"The one seated in front you, namely Youssouf.

"Was he armed?

"Yes. He was also the one who shouted, 'Abubakar akufi.'" And if I'm mispronouncing names, I apologize.

"Who did Youssouf enter the backyard with?

"Youssouf did not enter the backyard, he was just outside with me. He moved forward with me. He was with Christian Malanga.

"How many weapons did you lose?

"The head of the station that can answer that question. They took my GP and the weapon belonging to the person they killed outside.

"Who took your GP?

"Him, Youssouf. He took my bag, my two telephones, my $250 and $75,000.

"Who took the body of Abubakar in the backyard?

"Him here (Youssouf).

"Who carried the infrared weapon?

"It was Christian Malanga.

"When you saw the drones, did they come down?

"No. When I pointed a finger at them, the drones disappeared. Suddenly, the Jeeps appeared.

"For approximately how many minutes were they there for?

"Forty-five.

"According to you, did they have instructions?

"They were already prepared. I do not know which role each one played.

"When they left, did the noise from shooting stop?

"Yes."

And I'll stop there.

But, Your Honor, the point is, this was a coordinated armed attack. They planned ahead of time how they were going to do it. They had weapons to carry that out. And who pulled the trigger in a conspiracy is not -- they're all responsible, because they all planned and were there. They're all responsible for who pulled the trigger.

And then I want to play one other very short video clip from -- that I -- that we skipped before, because I was trying to be short on time. But it was one of the preattack planning videos. If you can give me one minute here, I'm going to find it.

THE COURT: No problem.

MR. WHITTAKER: This video was taken on or about

April 28th, 2024. This is a nighttime view as they drive by Kamerhe's residence. And near the end, right after they pass Kamerhe's residence, you'll see on the left-hand side there on the road, you'll see several individuals, which are believed to be Kamerhe's security guards. And you hear a male voice in the car that says, "Imagine that flamethrower coming right there."

My audio is not on. Just a second. Okay.

(Video played.)

THE COURT: What type of vehicle are they in?

MR. WHITTAKER: We don't know.

THE COURT: The lights, are they of any significance, going to the issue of whether there were people inside the government that were assisting or somehow involved?

MR. WHITTAKER: Yeah, we don't have evidence that we know of that -- I think it would -- I don't know how to answer that question. I don't want to speculate about what that could or could not have been.

THE COURT: Do you know whether the trial in DRC even alleged some inside personnel?

MR. WHITTAKER: We don't know, Your Honor. I don't have any evidence on that right now.

I do want to address one thing that -- I guess this is out of order -- that Ms. Lazaro mentioned. She said

that the NSA and the CIA were involved in this case. And we would not say one way or another, but Ms. Lazaro does not have a top secret security clearance and would not be authorized to know this kind of information. That kind of information would have been classified. And so there's no basis that's been provided for that statement, and I ask the Court to disregard that statement in its decision.

THE COURT: I understand.

Were there any -- she also made a claim -- pole cams?

MR. WHITTAKER: So I want to address that as well.

THE COURT: Okay.

MR. WHITTAKER: They indicated that somehow that the FBI knew about this. They had a pole cam up, and they let Mr. Thompson go ahead and go. The FBI did not have an investigation even open at that point.

What triggered the FBI's investigation was Mr. Thompson's mother called the FBI after the attack, asked for help to get her son out of the DRC. And then that led to the broader investigation. And all the information that's been found and discovered by the FBI has been after the fact, after the coup was over. So there was no pole cam up on anyone's residence prior to the attack.

THE COURT: Got it.

MR. WHITTAKER: Also, I want to address -- I guess

since we're talking about Mr. Thompson, I'll just focus on that, and then we'll move to the other two, if that's okay.

THE COURT: Okay.

MR. WHITTAKER: Ms. Lazaro talked about the firearm, the 1911 firearm, that we have possession of that firearm. We do not have possession of that firearm. The serial number on the firearm relates back to Mr. Moesser. You saw in the video that I played for the Court earlier, Mr. Thompson displayed that firearm, that 1911 firearm, in Johannesburg, South Africa. The video quality is good enough that the FBI was able to look at the firearm in the picture from that firearm and see the serial number on the firearm. And then the ATF ran a trace, and it points back to Mr. Moesser.

And in fact, that conduct, that Mr. Thompson removed the firearm from the United States, is found in Count 7 of the indictment, that he unlawfully took a firearm out of the United States to engage in a felony, a felony being all the other counts charged in the indictment. But we do not have possession of that firearm. It may be in the custody of the DRC. There's evidence that's still in the DRC and that they have custody of that. So it may still be that they have custody of that, but I don't know for sure whether they do or not. But the FBI does not have custody of that firearm.

Ms. Lazaro also talked about the family was not aware of Tyler Thompson doing any of this conduct prior to leaving Utah. Why weren't they aware of that? Because he lied to them. He's not trustworthy, Your Honor. He lied to his own mother. He lied to his own mother about what he was doing, because he knew if he told her what he was going to do, she probably would have tried to talk him out of it. But she lied to him -- or he lied to her.

And so to have him go live in the basement of that residence, that's where he was living when he committed the crime. You can't send him back there and have him live in the basement where he committed the crime with Marcel Malanga.

I didn't show the Court, but we have pictures of Marcel Malanga dressed in his battle gear, his black outfit that he wore during the attack, in Tyler Thompson's basement. A witness looked at that picture and said, Oh, yeah, I know that's the Thompsons' basement because that's Mr. Thompson's action figures there in the background. Marcel Malanga is dressed in that battle gear in that basement.

The flamethrower was in that house. Presumably, the firearm was in that house the morning that picture was taken with all the luggage. The firearm, the 1911, was in that luggage, presumably, because they were headed to the

airport.

So the crimes occurred there. That's not a suitable residence that you can send him back to and have confidence that those that live in the residence would detect further criminal behavior, including dangerous acts that were taken by these defendants.

I think the Court asked about, and there was some discussion with Ms. Lazaro about a police vehicle that was ahead of Christian Malanga's car when they were scouting out Mr. Kamerhe's residence. I just want to tell the Court, we don't have any -- it would be speculation about what that car was doing, or who it belonged to, or who was in that car. We don't know that.

But there was some type of vehicle. I don't know that it was a police vehicle, but there was a vehicle that seemed to be ahead of them, maybe pointing things out. I saw a hand come out of the window and point at some things. Who those people were, we don't know.

THE COURT: It struck me more of a taxi than police. But again, I don't want to speculate.

MR. WHITTAKER: Yeah, from our side, it would be speculation. Okay. I think that's all I have to respond on Mr. Thompson.

THE COURT: Thank you.

MR. WHITTAKER: As to Mr. Malanga, I know

Ms. Stirba talked a lot about there was a grandiose vision of his father, and that's what motivated him to do this. He never would have done this but for his father.

I tried to find -- there's another video in the discovery. I don't have it with us today, but I've seen it. And actually, there's a couple videos, where I'll just briefly give an overview for the Court. And this is my summary of the best of my memory of seeing it a month ago.

But Marcel in there is talking with his sister in some live chat, some FaceTime-type video with his sister and a sister's friend. And he's joking about how it's going to be Inauguration Day soon, how they're going to be in power, and they're going to be rich. And there's going to be -- like invite a bunch of girls over to there, and they're going to -- it's going to be, like -- it's like he's joking about how fun this is going to be. And in there, what struck me by that, is that he's motivated by greed, by power, and by women.

And to try to blame this all on Christian, yes, it may have been Christian's plan initially, but Marcel willingly, knowingly bought into it and agreed to participate. And to try to minimize it so much to say he's not responsible for the conduct that we've now been in court all afternoon watching what he did and orchestrated -- he tried to recruit his own football friends. And he was

successful at recruiting Tyler Thompson. He tried to recruit others, who thankfully said no. But he was part of the mastermind of this plan. He was a mastermind behind it, as well as his father.

As it relates to the address where it's proposed that he lives, the FBI believes -- and I've just been given this by a special agent -- that that address of 8916 South 4420 West, West Jordan, Utah, the FBI has linked this address to Global Solutions Mining. And Marcel had a card from Global Solutions Mining that he used to make purchases. And Marcel is, in fact, a registered agent for Global Solutions Mining. And the FBI believes that Global Solutions Mining was used to finance purchases for the coup.

THE COURT: That's the West Jordan address?

MR. WHITTAKER: That's the West Jordan address, the 8916 South 4420 West.

THE COURT: Okay.

MR. WHITTAKER: And that's the proposed residence that's for Marcel.

We would object to him staying in that residence, in that it would not provide satisfactory assurances for the Court that he would not be a risk of flight and would not be a danger to the community.

I want to address the fact that Ms. Stirba talked about how Christian and these other members of the

conspiracy, they weren't a warlord, they were trying to help free the people of the DRC.

I think I would point the Court back to the fact that this was about their own greed, their own power. It wasn't about trying to free the people of the DRC. Christian Malanga wanted power, and he was going to take all efforts and stop at nothing in order to obtain power for himself. And he recruited all those others to participate in that so that he could be the president, and he could have power, and that his son would have power.

His son had claimed to the Ukrainian soldier that he was chief of staff of the army. It shows Marcel's intent to have power in a government and have influence. Ben Polun held himself as chief of staff to Christian Malanga, again, showing a lust for power.

And so this was not just about an altruistic move. If this was about an altruistic move, you would operate within the bounds of a free election. You would run for political office. You would not resort to violence and death, especially death of an innocent civilian.

There's no -- how are you helping the people of the DRC, and freeing them from what? Oppression? Oppression from what Christian just put onto them? An innocent man in the middle of the night driving home with his girlfriend, and he killed him. For what? A vehicle

that he could use in his armed coup attack.

As to Marcel, there's no conditions of release that could ensure the safety of our community and ensure and protect against a risk of flight.

As to Mr. Moesser, what the FBI's investigation showed as related to Mr. Moesser, that he did have an interest in this attack. And that, yeah, he cares about hunting, and he cares about hunting a lot.

If you look at his residence, it's full of taxidermy animals all over the place. He's very much spent his life engaged in hunting, and he enjoys doing that. And in fact, Christian Malanga had promised him that if they were successful at this coup, that Mr. Moesser would have exclusive hunting rights in the Congo. And that was enticing for Mr. Moesser.

There was an argument about how, you know, he didn't go and that there was no evidence that he was going to go. We did present the Court with evidence that he had a flight. We also played for the Court the recording, where he told the FBI he was going to go to Johannesburg and then drive to the Congo to deliver the Congo specials. That's his own words.

THE COURT: Can you pull that up one more time, please.

MR. WHITTAKER: Sure. You'll have to give me a

minute to find it.

(Audio played.)

THE COURT: Thank you.

MR. WHITTAKER: He intended to go, and for some unknown circumstances, he didn't make it there. But in this case, we're talking about a conspiracy. So there was argument about there was no evidence of use of the explosive devices in the DRC. That's correct. But they conspired, and they built them. Here, they took overt acts to construct those devices. We don't have any evidence that shows they actually dropped one from a drone. But that was their plan. That's what they conspired to do. That's the criminal act.

And then he kept those devices in his backyard for a year until the FBI came and recovered them. And what did he do? He lied to the FBI when they asked him if he still had them. He said, "No, I got rid of them." He lied.

THE COURT: He didn't say, I don't know, he just flat out said...

MR. WHITTAKER: "I got rid of them."

THE COURT: "I got rid of them."

MR. WHITTAKER: "I got rid of them."

THE COURT: Okay.

MR. WHITTAKER: And then an hour or two later, the FBI found them in his backyard and in his bedroom and his

shop and -- I guess I don't know the timing. But, like, he lied to the FBI about where they were and what he'd done with them.

And then Your Honor asked about whether he ever disclosed that room, hidden room with all the firearms in it to the FBI; he did not. And I think the response was, Well, the FBI never asked about it. Well, the FBI didn't know it was there. It wasn't until later they discovered it was there, then we wrote another warrant, we went back, and we searched.

But I'll tell you who he did disclose it to, Marcel Malanga and Tyler Thompson. Because they went downstairs in that secret room, and they took pictures of the guns on the wall and then put it on social media that says, "war" and "more war." So he disclosed it to those members of the conspiracy who he wanted to disclose it to.

And then not only -- I just want to add one more point. Not only is, for Mr. Moesser, this a conspiracy case -- yes, he didn't travel, but he conspired, and I talked about that -- but he also provided, he actually provided material support, as in Count 2. He provided material support. Not a conspiracy to provide material support, but he actually provided material support. And then he provided weapons training. He provided explosives training. He provided a firearm to Tyler Thompson, as

charged in Count 7.

THE COURT: Do you believe that the training with the bodyguards is part of the conspiracy, after learning more about the date?

MR. WHITTAKER: We don't know the timing of that. So I don't know the timing. But we did try to ask Tooele County about, if they had a record of the call out, or whatever, and the FBI -- Tooele County couldn't provide that.

But what we do know is Christian Malanga had been involved in a coup in the DRC in, maybe -- what was the earlier time period? Hold on one minute.

(Pause in the proceedings.)

I don't have the exact date, but he was involved in some type of coup attempt prior to 2017. He was arrested, and he was -- one of the witnesses talked about that he -- I don't want to say tortured, but was attacked in prison. But what we do know is the FBI also knows that as early as 2017, there's -- in Ben Polun's email account, there's plans for a transition government as early as 2017. So it is very possible that Mr. Moesser and Mr. Christian Malanga had been conspiring to do this for some time, because there is evidence, at least with Mr. Polun, and...

THE COURT: So a prior coup attempt from Christian Malanga in 2017?

MR. WHITTAKER: It would be before that. I don't have a date. So I guess the Court probably shouldn't rely upon that, because I'm not providing it with specific enough information.

But what I can tell the Court is the FBI has evidence from Mr. Polun's accounts that there was preparations for a transition government in the DRC in 2017.

THE COURT: Okay.

MR. WHITTAKER: But I guess -- the indictment doesn't charge back that far. That's probably background information. The indictment doesn't charge a conspiracy going back that far. But what we for sure know with Mr. Moesser, the Court has seen it in the videos, he provided explosive training and explosive -- and built and manufactured explosive components. So he did provide material support, and he conspired to do that as well.

We would say that, based upon all the factors together, when the Court considers all of that together, even if there is positive history and characteristics, the nature and circumstances of the offense, the weight of the evidence, and the dangerousness of these defendants far outweigh, far outweigh any positive history and characteristics they have. And we'd ask that they all be detained. Thank you, Your Honor.

THE COURT: Thank you. Everyone, I know you've

been very patient. I need just a couple of minutes to collect my thoughts. Meanwhile, I'd like to talk to my probation officers that are here.

Officers Stanworth and Ponder, would you guys come up here for a second.

(A break was taken from 5:47 p.m. to 5:54 p.m.)

THE COURT: All right. Everybody. Thank you. I know it's been a long afternoon for all of you.

It's been a long afternoon, as I say, and for good reason. The case is very serious, and the liberty interests of the defendants is paramount. The Court has a special obligation to determine whether the government has met its burden that the defendants pose a risk of flight or an unmanageable danger and, therefore, should be detained, or alternatively, whether they should be released.

It's important, especially because we have guests here, to walk through the system a bit just to make sure everybody understands how it happens.

First, detention is only permissible in federal court if there's a triggering mechanism. No pun intended. It's a mechanism that allows a detention hearing to go forward. There's been no contest here that detention hearings are warranted under the law.

We also, you may have heard us talk about things like presumption of detention. There's been no contest that

there is not a presumption of detention. That doesn't mean that detention is warranted. Ms. Stirba, among others, carefully and properly indicated that a presumption of detention doesn't mean absolute detention. It's a factor that the Court considers. It's just one of many data points. It does shift a little bit of a burden to defendants. Defendants have to show by a burden of production that they can rebut the presumption.

Counsel has capably argued that the rebuttable presumption is not too difficult to meet. In other words, the burden of production is not so substantial that it's virtually impossible to meet. In fact, the opposite is largely true. It's fairly easy to meet. It doesn't mean, as I say, that if you meet the rebuttable presumption that that means you're absolutely released.

So to summarize, there's no absolute detention. There's no absolute release. But the rebuttable presumption remains, all the same. So if the presumption is rebutted, it's still one of many factors that the Court would consider in determining whether someone should be detained.

The defendants may have heard us talk at some length here today about things like categories; in other words, the factors that the Court has to consider in determining whether you should be detained.

To summarize, those factors are: Nature and

circumstances of the offense; weight of evidence; history and characteristics of the person; and fourth, the nature and seriousness of the danger posed by release. These are the factors we've been describing here today. And the Court's obligation is to consider all of them together in their totality. There may be certain factors that tip in the favor of detention. There may be some that tip in the favor of release. It's the Court's job -- and I have to say a difficult job -- to determine what weight to give to those factors.

We've had some discussions here that, speaking of weight, the weight of the evidence is one of the factors the Court considers the least. I would say that there are some courts that indicate that the weight of the evidence is entitled to less overall weight. But I think it's a factor that has merit.

Ms. Stirba properly noted that, if I place too much weight in the weight, then that sort of crosses that line from determining detention standards to sort of preemptively presuming guilt. So even though we've talked a great deal here today about the evidence against the three of you, this is not an adjudication of guilt. I have to determine the strength of the evidence as it relates to all of you, because that is a factor that Congress authorizes, and indeed, requires under Bail Reform Act. But this is not

an adjudication of guilt.

I want to talk for a moment about the discovery. You may have heard that all three defense counsel noted, Hey, look, we haven't seen the discovery. This is one of the biggest challenges when it comes to detention in federal court. In other words, if the history and characteristics -- or I should say nature and circumstances of the offense and the weight of the evidence are entitled to consideration by the Court, this is where it gets difficult.

Your attorneys, who are all capable, we saw evidence of that here today, if they haven't had a chance to review the evidence, how can they meaningfully rebut what the government has set forth in their proffers here today? And the truth is, it's hard to do it. They can't.

I liked the suggestion from Mr. Merrill that -- and I've done this in past cases -- that there are times where the weight of the evidence proffered by the government doesn't turn out to be as strong as it was proffered to be. That can always be an avenue for discussion down the road. What we've typically seen in that regard, if someone is detained, is a motion to reopen, saying, Look, the Court indicated it relied on proffer A. I have information to believe that proffer A isn't entitled to the same sort of weight that the Court gave it when you originally ordered

detention.

It's therefore difficult, especially in a case like this with the amount and volume of the evidence, for your counsel. They can't work magic. They haven't had a chance to review all of that in detail to be able to meaningfully rebut, in some ways, the proffers of the government. On the other hand, we don't want people hanging out in custody for months on end while discovery gets reviewed.

So what happened today is very much -- or very common. I, frankly, had wished that the discovery had been in your possession before now. I did not know that before today. But what I can say is that no one has requested a continuance of the proceeding. In other words, no one said, Look, I'd really like some time to dig into what the government proffered here today, and I need some time to do that before we go forward with the case. If that had been asked for, I certainly would have granted it. But as we say, it's difficult. It could take months, weeks, certainly, to review it in full, or do we go ahead and go forward with the liberty interest of detention?

I tend to think that the liberty interests are so important, we need to get them as quickly as we can. And we've tried to do that here today.

It also requires me to be as deliberate as

possible. You've been here for over four-and-a-half hours now. Probably frustrated. But the reason that we're here is because each defendant deserves the full and fair opportunity to present their cases. The government has that opportunity, too. And, in fact, the government must have that opportunity, because they have the burden of persuasion. Even if the presumption is rebutted, the burden always stays with the government.

So that's why things have turned out the way that they are. And now let me go to the factors individually.

It can be -- it is undisputed and cannot be disputed that this is one of the most serious offenses that the Court has seen. The nature and the circumstances are exceptionally troubling. We've talked today about the intention to travel to another country, where a legitimate foreign government rests, and to take over that government, not by peaceful means, not by protesting, not by hopes, not by demonstration, but by violence. That was the aim from the very beginning.

And sometimes in court, we can see individuals -- all we focus on is the aim, but we don't get to see -- or where it hit, but we don't always get to see the aim. Here, the aim and the hit was largely the same. It just turned out to be unsuccessful.

But it's very clear to me that this was not

impulsive. This was not -- not in the strictest sense. It wasn't waking up one morning and saying, Hey, I think we should go to DRC and overthrow the government. This was planned. It was careful. It was thoughtful. It turned out to be unsuccessful, and maybe even a little naive. Ms. Stirba used the term "grandiose." I would say that might apply, too. But the six people who are dead probably wouldn't say it was grandiose. They ended up being killed because they were involved in something that turned out to be far more than an episode of Call of Duty or an evening of video games.

It took this idea, which by definition had to involve taking over the government by force. The president was not going to turn over power upon the persuasive powers of Christian Malanga or others. And so it meant that you had to prepare by force. That means things like firearms, recruiting, planning, preparing, traveling.

And the travel, by the way, I think is pretty interesting to me. Ms. Stirba makes a compelling argument -- and I don't doubt that some of this true, from my perspective -- that Marcel Malanga was interested in, I think a connection with his father. I don't have any problem concluding that that is true. But desire to work with does not mean unduly influenced by, at least not from my perspective.

Think of the months or weeks or maybe even years, if I understand it correctly, that Marcel Malanga did not live with Christian Malanga. And that's important because, if the idea is that, He had such control over me that I had to do what he said, I don't think that really has much support.

Think of the travel here. Think just of the planning first in the District of Utah that had to take place. There were things that Mr. Malanga -- Marcel Malanga's alleged to have done here in the United States without any physical presence from Christian. It was recruiting, it was researching, it was bringing other people in, and it was preparing for a plan, a violent and dangerous plan by definition, as I noted earlier.

Therefore, I think it's hard to say, or at least hard for the Court to conclude, that this sort of influence from his father put him on a point from which he could not return.

And think about the travel: Johannesburg, then Angola, then the DRC. I took a little bit of liberty during the break to look at the drive time from Angola to DRC. It looks like it's about 11 hours, substantial in its own right. And if you examine the drive, which we also talked about, from Johannesburg all the way up to DRC, you're talking a nearly 2000-mile drive. In other words, who was

not present during all of those activities? Christian Malanga.

Maybe his influence was felt, but his actual presence, such that I could conclude that Marcel felt he was compelled to -- that Marcel felt he was obligated to comply with his father's wishes I think is a little too tenuous for me.

Ms. Stirba says, Well, what's the relevance of that? I think she's right. The relevance is, if Mr. Malanga plays an undue -- Mr. Christian Malanga plays an undue influence on Marcel, Marcel may not be the dangerous person that the government alleges. But what if the opposite is true, that there's influence from Christian Malanga, but not an overbearing presence from Christian Malanga himself?

I think the latter is true. I think that Marcel Malanga was interested in pleasing his father, assisting his father. But I also think that he had his own interests in mind.

I don't think it's coincidental that he anticipated that he would be a chief of staff or the director of the military. In other words, there were mixed motives for Marcel Malanga. And if there are mixed motives, meaning his own motives, then the absence of Christian Malanga from his life, I don't think suddenly turns him into

a safe person, at least not from this Court's perspective.

But as I say, the plan, by its definition, was intended to result in violence and to, I think, fairly anticipate the murder of others to accomplish that aim.

There's a video of Mr. Malanga, I think it's the final -- Marcel Malanga, the final video the government proffered where he said, "Hey, you're free." Again, I think there may be a mixed motive. Maybe in Marcel Malanga's mind there is some value to what they were doing. But the fact that they would see value, and the irony, from my perspective, of killing people in order to make a country better. I know people have thought that. In countries that have suffered from coup d'états, they have always had that, We're going to be better. We're going to make it safer. But there is a strange logic to that, in my mind. This logic that, in order to make the Congolese people free, we're going to have to violently kill others to do it.

Absent from those discussions are peaceful means of trying to effect change. Maybe very frustrated. Maybe a belief that it would be unable to effect the change that you would seek for Congolese people. But I don't think that was really on the table. I think the opposite is true. This is the first I've heard of Christian Malanga interested in a previous coup, so I won't take that into account. But it emphasizes to me that from the very beginning, this was

intended to, first, have a predisposition to commit harm. And if harm was required, harm was going to be had. The best evidence of that is the callous killing of the gentleman who is simply driving a car that's needed by Christian Malanga.

And I think when Mr. Thompson and Mr. Moesser and Mr. Malanga, Mr. Marcel Malanga, are charged as part of the conspiracy, was this foreseeable? Was this out of the blue? Was this something that you couldn't have foreseen? The Court assumes no. By definition, the planning contemplated murder. It contemplated harm. It contemplated kidnapping, and the weapons and the material that they possessed showed it. The handcuffs. The zip ties. The firearms. The drone. The weapons. The flamethrower. Every bit of it suggested that they were prepared to effect or use violence to effect their desired change. So clearly, the nature and circumstances of the offenses are so grave.

I agree with counsel that -- I'm not aware of case law that says, although Mr. Whittaker noted to some, that the nature and circumstances are so substantial that there's no way anybody could be released. I'm not sure I agree. If that's the proposition, I'm not sure I agree with it. In fact, I don't.

But the nature and circumstances are so great, that I think it manifests a potential danger. In other

words, despite all of this incredible support that's in the room, all the time, the effort, the deceit, the not sharing with family members, that reflects, to me, ongoing danger.

This idea that, I have people that are looking out for me now and I've learned my lesson from being in, no doubt, brutal conditions in the DRC. I can only imagine. But I don't think that it's fair to say that, because of what's happened recently, all those predispositions are gone.

I also think it's fair that there's a potential risk of flight issue, which we'll talk about in just a moment. But nature and circumstances of the offense, exceptionally grave and, by definition, resulted in the murder of six people.

Second, weight of the evidence. Parties are correct that the weight of the evidence, the Court usually gives less weight to the weight; in other words, as I mentioned earlier, this isn't an adjudication of guilt. Ms. Stirba noted that this isn't an exercise in preemptively punishing someone for alleged acts. But the weight of the evidence is significant. And think about what was witnessed here today, video after video -- self-recorded, by the way. Sometimes we think the weight of the evidence is substantial because of an investigation, meaning an observation by law enforcement. That's true, of course.

But here, the weight of the evidence is even stronger because it's from the defendants themselves, the videos that they take. The statements that they make, I assume, for purposes of wanting to refresh their recollection if they needed to use it. For instance, how to we install the flamethrower to the drone?

But the evidence here is not subject to the same sort of questioning that you might otherwise assume. These are from the defendants. Video recording -- and I think that's why the weight of the evidence here is entitled to more weight, because it's corroborated. It has reliability to it. It comes from the defendants themselves.

Mr. Moesser gave some significant statements. Made the decision to speak with law enforcement. Made some statements that I think are also reliable, admissions regarding what he intended to do or what he was involved with. He indicated several times that he wasn't lying, that he wanted to be honest with them. We even talked about most recently the trip that he had planned to take from Johannesburg up to the DRC or Kinshasa. I tend to think that, fortunately for Mr. Moesser, I mean, he didn't make the trip. I believe it was probably because of that trip with his wife. I could be wrong.

But there is corroborative evidence for the fact that he had desired to go. He hadn't expressed anything in

any of the text messages that have been proffered by the government that he said, You guys are on your own.

So I think, with all due respect to his counsel, yes, he was willing to sell, but I think more importantly, he was willing to advise, he was willing to be a part of. And in fact, he made himself a part of it.

And I believe he knew very well what the intentions were, probably from Christian Malanga himself, but certainly from Marcel Malanga. The statements and the messages reflect, and coupled with the video, that he knew, in my opinion, very well what was going to be happening in Kinshasa if the defendants had their way.

He provided training. He provided firearms. He provided instruction. He provided suggestions. And I think there's a problem with honesty as it relates to Mr. Moesser as well. I don't give too much weight to this, but in 2009, the issue with the black powder we talked about -- maybe it's not black powder, but cartridges -- that he was alleged to have given a false statement to law enforcement, I don't want to give too much weight to that because it doesn't look to me like he pled to that. It was pled down to a misdemeanor. But I'm concerned about what I perceive to be dishonesty in your interview.

I don't doubt what Mr. Merrill has said, that your home probably had, as he said, nooks and crannies

everywhere. But I also think it's fair to say that if you're making statements, absolute statements, such as, "Look, they've all been destroyed," or, "I don't have them," or, "They're gone," I think when they're found in, not just that food cart out back but in other places, including your bedroom, that suggests to me some untrustworthiness, some concerns that I have.

We've talked about how the government became aware of the room with the firearms apart from your information. You had no obligation to provide it. But I think the fact that if your statement is that you were cooperative, you tried to be forthright, I think the evidence suggests certainly a mixed bag, in my opinion, if not worse.

So the weight of the evidence here is, I think, astounding. And it's reliable. And it's created by the defendants themselves. It's the live-streaming of Mr. Malanga, first at -- I guess I'll say the surveillance. Everything from the surveillance the days or day before leading up to the attacks in the morning at Kamerhe's residence, and then, as they call it, the "White House."

Ms. Stirba noted that it looked like there was a point where Marcel Malanga became dazed, wide-eyed, and concerned. I saw that, too. I think that's there. But at that point, he had already made the commitment, and he had done it on his own. He had agreed to follow his father. He

had all the weapons. I don't think there's any reason to believe that he would be unwilling to commit violent offenses, if he had the opportunity and needed.

The history and characteristics are the factors that turn in favor of release for all three defendants, probably less so for Mr. Moesser just a bit, but for Mr. Malanga, certainly. The support here today is emblematic that you have more than rebutted the presumption of detention, based on this alone. You don't have any criminal history. Your attorney noted that, I think if I wrote it down right, this was a jaw-dropping anomaly. She didn't use the word "anomaly," but an exception to the type of qualities that you possess.

The presence of your family and friends here today, I think, reflect that they definitely see you that way. My guess is that they were probably shocked and a little scared as they saw all of the deliberative efforts that you are alleged to have made, everything from training in firearms, recruiting people with thousands of dollars, saying that you were ready for war, you were ready to kill, you were using lyrics that suggested that you were training in the U.S. and then Johannesburg.

But your history and characteristics, notwithstanding all of that, I think would tip in the favor of release.

Mr. Thompson, especially that, too. No criminal history, family support. I am, of course, concerned about the allegations that the government made, and they're just allegations, that you were able to hide, for lack of a better term, your true intentions.

It can be difficult for family members. They don't often know everything. But even if I gave that to -- gave that some weight, I'm concerned that you would be returning to people and residents that didn't know what you were up to before. I don't think that's enough to detain you on that basis alone.

History and characteristics tip in favor of release for Mr. Malanga and Mr. Thompson.

For Mr. Moesser, I tend to think they do, as well, but it's slight. His criminal history is a little bit older. I'm more concerned about what I consider to be dishonesty. Mr. Merrill noted that there's nothing wrong with being a firearm enthusiast, and he's totally correct. There's nothing wrong with being an avid hunter. That's totally correct.

But the allegations here go far beyond that. They go to a point of advising, assisting. Even your own term, the "ingenious" term that you used regarding how you would drop things from a drone, knowing what that might mean. Knowing that you had tested it out with primer. Knowing

that that would include buckshot. Knowing that would include shrapnel. I think all of that gives me some pause about your history and characteristics. But even assuming it tips in your favor a little bit, I'll agree with that for the record.

Finally, the nature and seriousness of the danger posed by your release. Much argument has been said here today regarding what danger they might pose. In other words, how could they recommit a similar offense? They have no prospects, real prospects of being able to travel, at least that's the argument. They have no prospects of committing similar types of crime. Family is aware of what what's going on. We have family that would be third-party custodians. This is probably the most challenging of the four factors here in this case, in my opinion.

The government has cited some case law that does reflect that the claim that the absence of future ability to commit harm may not be enough, especially if the history and characteristics -- I'm sorry, if the nature and circumstances of the events and the weight of the events are so substantial.

I think it is -- two things are true. Number one, the allegations of the ability to prepare for a violent overthrow of a friendly, lawfully installed foreign government reflect not just some recklessness, but some

dangerousness. The idea that this would be somehow possible, a good idea, knowing the violent risks at play, that strikes me as inherently dangerous. And if that sort of wild-eyed thinking remains, then I think a danger can remain as well.

I also am concerned with the type of planning and the months, the weeks, months that took place to come into this. There could have been countless opportunities for individuals to come to grips with what was actually being planned. And it wasn't just in the United States, it was in Johannesburg. I presume it was in Angola. And certainly, it was there in Kinshasa.

The problem is, as they patrol, as the video reflected, they surveil the White House the day before. The proffer does appear to suggest that they make claims that this is going to be easy. "This is something that's going to be good for the Congolese people. This is something that's going to be good for me," at least I infer that.

This sort of thinking that is so reckless and, by definition -- maybe they didn't fully understand it -- but, by definition, would have involved violence. I can't think of any reason that the government of DRC would have somehow acquiesced. And there was no intent for that to happen. That sort of thinking is serious. That sort of thinking is dangerous.

And notwithstanding arguments that they have sort of quote/unquote learned their lesson from what must be a brutal year in the DRC, consider what Mr. Malanga is alleged to have said when FBI is prepared to leave the country. He says, "You should have left me here," for lack of a better term.

I don't know how to infer that. It does concern me, though, that Mr. Malanga may feel that he is desperate. He may feel that he has put himself in jeopardy. He has put others in jeopardy. I don't know.

But what it does suggest to me is that Mr. Malanga has some risks of flight that trouble me. He has ties outside the country. I don't believe that he would necessarily take those, but I am concerned based on that statement that he might.

Speaking of risk of flight, the potential sentences here are very substantial. I don't mean to suggest that every case with a substantial sentence means someone should be detained. But it does mean, in my mind, that the risks of flight are increased. The attorneys know, probably better than most, what the type of guideline range sentences might be here if, in fact, someone is convicted. I don't assume guilt, but I think that poses a negative impact, a negative issue as it relates to risk of flight.

In the end, the Court concludes that the nature

and circumstances of the offense, the weight of the evidence, the nature and seriousness of the danger posed by all three of your prospective release tip in the favor of detention. History and characteristics may aid you in your quest, but they do not, in my opinion, overcome the other three factors.

The Court's ruling today is that each of the three defendants present should be detained pending the resolution of the case. That's the Court's decision.

Court is concluded and in recess.

MR. METOS: Judge, I do have a couple procedural issues.

THE COURT: Yes.

MR. METOS: Number one, the government proceeded by proffer using a PowerPoint. I asked Mr. Whittaker if that was going to be introduced to be part of the record. He indicated that he was not going to do that. I would make that request or that motion at this time.

THE COURT: Mr. Whittaker, any opposition you want to make for the record?

MR. WHITTAKER: Yes, Your Honor. We oppose their request for the PowerPoint. We will provide the underlying evidence for an ongoing discovery process. We've turned over one big production already, and we intend to turn over more evidence as soon as we can. We're still working

through all those issues. So we will give the underlying evidence, but we don't want to turn over the PowerPoint.

MR. METOS: Judge, it's not an evidentiary issue. It's not a question of disclosure. It's a question of having a full and complete record of the proceedings today.

THE COURT: Yeah. I am worried about that.

Mr. Whittaker?

MR. WHITTAKER: Your Honor, the record is a verbal proffer. And the PowerPoint was a means to communicate that in an efficient manner to the Court. But I could have stood up here and just proffered it.

And so we don't want to turn over our attorney work product to the Court as part of a PowerPoint. The underlying evidence is available and will be available to defense. The record has been taken down by the court reporter. And so we would oppose having to turn over the actual PowerPoint.

I guess, can I say one thing? I don't know what defense needs the PowerPoint itself for. They're going to have the evidence.

THE COURT: Is it because the evidence is consolidated in that one point, or because I've referenced it in the decision?

MR. METOS: There's a question of having a full and complete record, number one. Number two, he talks about

attorney work product. But they've waived that by introducing it in open court.

THE COURT: Yeah.

MR. METOS: And it's also a question of the way the PowerPoint was put together, because we are going to potentially appeal this, or after we get the evidence, ask for reconsideration.

Just Mr. Moesser's statements alone, that wasn't a full and complete disclosure of what was said. The context wasn't there. And having that context to allow us to prepare for that in the future would be very helpful.

But primarily, the important point is having a full and complete record before this Court.

THE COURT: Yeah.

Any final thoughts?

MR. WHITTAKER: A full and complete record has been entered by the court reporter, and they can order a transcript. They've been provided the full and complete audio recording of Mr. Moesser. They have that. And if they wanted to play any part of that today, they could have. And so they have that. And we will give the underlying evidence. There's no dispute about that.

THE COURT: Mr. Metos, I'll grant your motion. I'll ask the government to submit the PowerPoint. If you want, we can keep it under seal for purposes of the record.

But I'd like you to submit it. It will have to be on a flash drive, no doubt.

MR. WHITTAKER: Okay.

MR. METOS: The other issue is, Mr. Merrill did make a motion pursuant to Rule, was it 26 -- 26.2. If the government can assure us that those particular statements the informant, I believe it was Gonzalez, and -- it started with a W -- Wright, if those are in the discovery materials, that's fine if that assurance is there. But we'd ask the Court rule that the government provide that if it's not in the previously disclosed materials, that they be disclosed.

THE COURT: 26.2 relates to after a witness, other than a defendant, has testified on direct examination. So I wondered if it was sort of misplaced in a detention hearing.

But even with that, Mr. Whittaker, I assume that's part of discovery?

MR. WHITTAKER: It will be, Your Honor. We're working on a protective order to protect that. The issue we have is, we did not identify for the record -- several names that were thrown around -- who the CHS was. We're not confirming any of that.

But where we do have concerns is that there were some veiled threats made to that individual by family members of one of the defendants. And so we have witness safety issues. And so we need to protect that. And

traditionally, the government wouldn't turn over and identify who that CHS was until closer to trial, if that person was going to testify. So we will work with defense counsel. We have no problem doing that.

But as far as timing of that goes, we would like to reserve the right of when we do that for witness safety issues.

MR. METOS: I direct the Court's attention and Mr. Whittaker's attention to subsection (g)(4) of that rule, which requires disclosure when the evidence is submitted in court. By making a proffer, they are essentially substituting that statement --

(Disruption from members of the audience.)

MR. METOS: They're substituting that statement --

THE COURT: Hold on one second.

The people that are talking in the back, you need to be excused.

(Members of the audience left the courtroom.)

THE COURT: This is precisely that concern regarding the information being turned over with a protective order.

MR. WHITTAKER: This is exactly why we can't turn it over right now, Your Honor. That witness is in serious jeopardy.

THE COURT: Let's have a motion on that, and then

I'll address it in a sealed hearing.

MR. METOS: Okay.

THE COURT: Anything else, Mr. Metos?

MR. METOS: We did ask for a meeting about CJA funding, but we'll...

THE COURT: I'm happy to do that with you, if you would like.

MR. METOS: We'll do that at a later date.

THE COURT: Okay. Hearing is concluded.

MR. WHITTAKER: I wonder if we could put on the record what happened, because that's going to -- can we just state what happened and go back on the record?

THE COURT: Counsel, just one second. There was a request to put on the record what just happened.

Mr. Whittaker, do you want to make a proffer?

MR. WHITTAKER: I do, Your Honor.

The Court referenced some conduct in the courtroom. There was at least three individuals in the galley that got extremely upset and angry and were very verbal and stormed out of the courtroom in an angry type of outburst. I don't know if I misinterpreted it. Anyway, but just so we have a record of what happened and it's in the court record.

THE COURT: Ms. Stirba, anything you want to add on that?

MS. STIRBA: No.

THE COURT: All right. It's noted for the record.

MR. WHITTAKER: And they were at least one family member of one of the defendants that was in the three that stormed out of the courtroom.

THE COURT: Okay. Hearing is concluded.

(The matter concluded at 6:30 p.m.)

COURT REPORTER'S CERTIFICATE

State of Utah )
ss.
County of Salt Lake )

I, Michelle Mallonee, a Registered Professional Reporter in and for the State of Utah, do hereby certify:

That the proceedings of said matter was reported by me in stenotype and thereafter transcribed into typewritten form;

That the same constitutes a true and correct transcription of said proceedings so taken and transcribed;

I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action, and that I am not interested in the event thereof.

WITNESS MY HAND at Salt Lake City, Utah, this 16th day of June 2025.

Michelle Mallonee

Michelle Mallonee, RPR, CCR
Utah CCR #267114-7801
Expires May 31, 2026.